(No. 60167

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ANTHONY HALL, Appellant.

*Opinion filed October 17, 1986.—Rehearing denied December 1, 1986.*

384

SIMON, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and James E. Chadd, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Anthony Hall, of Menard, *pro se.*

Neil F. Hartigan, Attorney General, of Springfield, and Donald D. Bernardi, State's Attorney, of Pontiac (Roma J. Stewart, Solicitor General, and Mark L. Rotert, Sally L. Dilgart and Scott Graham, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

The defendant, Anthony Hall, while an inmate at the Pontiac correctional institution, was charged by indictment in the circuit court of Livingston County with the murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) of Frieda King. Following a change of venue to McLean County, the defendant was found guilty of murder in a bench trial in the circuit court. A hearing was held on the State's motion to determine if the defendant was subject to the death penalty. The court found a statutory aggravating factor to exist, in that the victim was an employee of an institution of the Department of Corrections killed in the course of performing official duties (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(2)), and the court determined there were no mitigating factors sufficient to preclude imposition of the death sentence. The defendant was sentenced to death, but the sentence was stayed pending a direct appeal to this court under section 4(b) of article VI of the Constitution of Illinois (Ill. Const.

1970, art. VI, sec. 4(b)) and Supreme Court Rule 603 (87 Ill. 2d R. 603).

At approximately 6:30 p.m. on February 8, 1983, the body of Frieda King, who worked as a civilian supervisor in the inmate kitchen at the Pontiac Correctional Center, was found in a locked closet near the cold-storage area of the kitchen facilities. The autopsy performed by Dr. Edward Shalgos revealed that King died from severe blood loss resulting from stab wounds in the upper portion of her back and chest. The victim's lungs, aorta and liver were lacerated, and at least one of the wounds was inflicted by a left-handed assailant. There was evidence of hemorrhage within the muscle tissue of her neck, suggesting to Dr. Shalgos that King had been manually strangled. There also were cuts on her hands.

The focus of the investigation into King's death turned to the defendant, who worked as a clerk in the inmate kitchen on February 8. On February 14, 1983, Livingston County State's Attorney Donald D. Bernardi filed a criminal information in the circuit court charging Hall with the murder. (The criminal information was later superseded by an indictment.) At his arraignment on February 23, the defendant requested a preliminary hearing and informed the court that he did not wish to be represented by the public defender.

At two subsequent hearings the defendant told the court that he had been unable to engage a lawyer. On March 8, the court appointed Livingston County Public Defender David Ahlemeyer. The next day, Ahlemeyer filed a jury demand and the defendant's affidavit to his indigency.

Then followed correspondence between the defendant and Judge William T. Caisley in which the defendant expressed, without explanation, his dissatisfaction with Ahlemeyer and requested that the court appoint counsel other than the public defender. Generally, the defendant

complained that he was unable to establish a "rapport" with Ahlemeyer, apparently out of fear that the public defender's ties to the community and "political concerns" would weaken his representation of the defendant. The court, in a letter responding to each of the defendant's letters, explained that the right to representation included the right to counsel of choice if the defendant was able to afford private counsel, the right to have the public defender appointed in the event he could not retain private counsel, and the right also to represent himself. The court instructed Hall that it would appoint counsel other than the public defender only upon a showing that a conflict of interest would prevent the public defender from representing him. The court also cautioned Hall as to the seriousness of the charges against him and encouraged him to cooperate with Ahlemeyer in preparing a defense.

On May 5, the court allowed the defendant's motion for a change of venue, and the case was assigned to the circuit court of McLean County.

In a letter postmarked June 20, the defendant again complained to Judge Caisley about Ahlemeyer's representation. He wrote that the court "had the factors in front of you, conflict of interest [would be an] understatement, etc [sic]." He also supplied the names of two attorneys with whom he claimed to have been in contact and asked the court to appoint one as his counsel. The court replied that, if there was a factual basis to the defendant's contention of a conflict of interest, he should make a motion to have Ahlemeyer withdraw and the court would conduct a hearing on the motion. The prosecution was given notice of this correspondence between the court and the defendant.

On August 17, the defendant filed a "motion to discharge" the public defender. Ahlemeyer, in turn, filed a motion to withdraw. At the hearing on both motions,

Ahlemeyer told the court that the defendant refused to cooperate with him and recounted an incident in June when he was at the Pontiac institution when the defendant refused to leave his cell and meet Ahlemeyer. The defendant was allowed to address the court. He stated that he personally did not dislike Ahlemeyer, but that he did not believe the public defender would act in his best interest because Ahlemeyer "was in reliance" with the State's Attorney. Ahlemeyer assured the court that he had no animosity toward the defendant and that there was not a conflict of interest which would affect his representation. The court denied the defendant's motion to discharge the public defender, and denied Ahlemeyer's motion to withdraw.

At the same hearing, the court allowed defense counsel's request that a psychiatric examination be given Hall to determine his fitness to stand trial.

On October 4, the court conducted a hearing on the defendant's fitness to stand trial. Ahlemeyer was allowed to testify as to his representation of the defendant, stating that Hall again refused to see him and that it would be necessary for Hall to revise his behavior of noncooperation. The defendant testified that his refusal to cooperate with Ahlemeyer was not a reflection of any unfitness to stand trial, but was a "deliberate *** rational act." He then told the court: "I am not going to cooperate with him and if he comes within an arm's length of me I will spare you the particulars. If that is what I have to do to get him off this case, I will rise to that occasion. I can only get an assault charge." The court found the defendant fit to stand trial and continued the matter until November 1.

On that day, Ahlemeyer asked that the defendant be shackled while he was in the courtroom. The court, after reading a letter addressed to the court in which the defendant substantially repeated the threat made earlier,

ordered the defendant shackled. The court then heard argument on the defendant's renewed motion to discharge Ahlemeyer. The public defender again stated that he felt able to represent the defendant. The court again found that no grounds existed to release Ahlemeyer from Hall's representation, but he offered to appoint the McLean County public defender to assist Ahlemeyer at trial. The defendant refused the offer, informing the court that attorney Shelly Bannister had corresponded with him and agreed to represent him if the court would order her appointment. The court declined to appoint private counsel.

On December 5, the defendant asked the court to appoint McLean County Public Defender Steven Skelton to assist Ahlemeyer. The court granted the request. On February 21, 1984, at a hearing on the defendant's motion to suppress statements made by inmate Juan McGee, the court ordered the defendant unshackled.

Following three days of jury selection, a dispute between the defendant and his attorneys was brought to the attention of the court. The defendant wanted certain witnesses to testify at trial, but both counsel believed that their testimony would be extremely detrimental to his defense. Hall told the court that he wanted to proceed *pro se*. The court urged the defendant to consider the matter overnight and held the proceedings until the next day.

The following day the defendant again stated that he wished to proceed *pro se* and asked for a continuance to prepare his defense. The court brought the defendant, defense counsel and a court reporter into a conference room adjoining the courtroom to discuss the defendant's representation. The court advised the defendant of the unwisdom of proceeding unrepresented in a capital case. The defendant suggested that defense counsel be present and available to make objections on his behalf, but that

the defendant be allowed to examine the witnesses. Ahlemeyer objected to the proposal, pointing out that Hall's dissatisfaction with defense counsel at that point was not with their ability to examine witnesses, but rather with the decision not to call certain witnesses. Ahlemeyer contended that it would constitute incompetence to stand by and allow the defendant to introduce highly prejudicial testimony. The court asked Hall who the witnesses were that he wished to call, but before Hall could answer Ahlemeyer objected because he believed it possible that a jury trial might still be waived and that the court would then be the trier of fact. There followed an interruption in the record, after which the court stated:

> "Let the record show that the defendant has now been removed and that the prosecution is now present in chambers and that we are outside the presence of the jury and the persons assembled in the courtroom, and let the record further show that defense counsel, Steven Skelton has just been struck on the head by the defendant with a chair and that the court has also been struck by the defendant on the head with his fist and at this point, bearing in mind the previous threats that were made by the defendant at the pretrial stage against defense counsel, the court is going to order from this stage on the defendant shall be shackled at all times whether in the presence of the jury or not because it is essential for the security of the court and the officers of the court. This decision has been made only with most reluctance, but I think that with this overt act and the fact that one defense counsel and the court itself has been attacked by this defendant indicates the necessity of this step which is most reluctantly taken."

Upon returning to the courtroom, but still outside the presence of the jury, the court asked whether the defendant wished to proceed with or without counsel. The defendant refused to speak, and the judge inter-

preted, he said, the defendant's silence as a withdrawal of his motion to proceed *pro se.* Skelton and Ahlemeyer requested that the court grant their withdrawal motion, arguing that the attorney-client relationship was irretrievably lost and pointing out that the occasion may arise when they might be called to testify against the defendant in a separate proceeding arising from the battery. The court stated:

"I appreciate the fact that defense counsel have had more than their share of difficulty in the representation of this defendant. However, under the circumstances just minutes before the trial is to begin I don't think at this point I can in all fairness allow defense counsel to withdraw."

During the prosecution's opening statement, the defendant interrupted to inform the court that he wanted to waive a jury. The court replied that it would consider the waiver after opening statements. After the prosecution concluded and defense counsel reserved an opening statement, the jury was excused and counsel repeated the defendant's request to waive a trial by jury. The court admonished the defendant as to the charges against him, that the court would determine his guilt or innocence and the range of possible sentences if judgment were entered against him. Hall said that he understood, and the court accepted his jury waiver for the guilt phase of the trial. The defendant stated that he wanted to waive a jury throughout the proceeding, but the court explained that a waiver for the sentencing procedure was premature and, if necessary, would be considered later. The court then summoned the jury and instructed its members that a trial by jury had been waived, but that they should not listen to or read media coverage of the trial because there was "the possibility that you may be required to determine the matter of punishment."

The State's first witness was Randall Mundschenk, the dietary manager at the prison, who stated that Frieda King's job was to supervise inmates in the preparation and serving of prison meals. He said that it was prison procedure for all inmates to be escorted out of the cold-storage area at the end of the supervisor's work shift, and that on the day of King's death the shift of the defendant's supervisor, Richard Friedman, ended at 3 p.m. Mundschenk testified that he left the institution around 4:30 in the afternoon, but that he returned around 6:20 after receiving a phone call informing him of a problem at the institution. He proceeded to the cold-storage area and was told that King was missing. Mundschenk asked that the key to the storage closet be brought to him because that room had not yet been searched. After the keys were produced Mundschenk identified the key which opened the closet door, and King's body was found in the closet.

Richard Friedman testified that he worked as a food supervisor in the cold-storage area at Pontiac from 7 a.m. to 3 p.m. on February 8, 1983. Upon conclusion of his shift, he checked the doors to the cold-storage area, hallway, bathroom and coolers to ensure that they were locked, and then handed his keys to King. He said the procedure was for a supervisor to turn over his keys to the supervisor who was to relieve him. Friedman testified that the defendant had left the area before the 3 o'clock changeover, and that he therefore did not escort Hall from the cold-storage area.

An inmate at the institution, Michael Hughes, testified that he was assigned to the scullery area of the kitchen, where he washed dishes, and that he reported to his assignment around 5:15 that day. However, instead of washing dishes, he and another inmate, Ronald Louis, began making bacon sandwiches in the kitchen area. While making the sandwiches, the witness saw the

defendant emerge from the alleyway which leads to the cold-storage area. Hall had blood on the front of his shirt and blood on his left hand. The witness estimated the time to have been around 5:30. Hughes testified that the defendant picked up the kitchen phone, which prison procedure prohibited him to use and, in response to Hughes' question, Hall said that he was trying to call Lieutenant Mundschenk. The defendant also told Hughes that the blood on his shirt came from moving ground beef in the cold-storage area. Subsequent testimony established that there was no ground beef in the storage area that day.

Derrick McGee, an inmate working as an assistant cook on February 8, testified that at approximately 5:30 on that day he first saw the defendant and the victim King talking in an office in the kitchen area and then saw them walk toward the alleyway leading to the cold-storage area. He stated that he saw no other inmates with King in that area on that day. He said that a supervisor in the upper dining room, Odette Koch, called and asked to speak to King. McGee answered that he did not know her whereabouts, despite having just seen her walk to the alleyway with Hall. On cross-examination, he could not recall whether he saw inmates Edward Stokes and Felton Chase, who were assigned to take out the garbage in the kitchen, walk to the garbage area by way of a door near the entrance of the alleyway. He also admitted that he did not tell the investigators until January 3, 1984, that he had seen Hall and King walking toward the alleyway.

Ronald Louis, an inmate who worked as an assistant head cook, stated that he was making bacon sandwiches when he saw Hall and another inmate in the office with King. He testified that he saw the defendant and King walk toward the cold-storage area between 5:30 and 5:35. He said that he did not see anyone else go back

there. The witness stated that he gave inmate Eugene Davis two bacon sandwiches because Davis was complaining about the extra dishes he had to wash after the sandwiches were made. Louis testified that he saw Davis eating the sandwiches in a sitting area near the special-diet kitchen moments after he saw Hall and King walk toward the storage area. Louis returned to the area where he was making the sandwiches and picked up a phone that was ringing. Just then Odette Koch walked in and the witness handed her the phone. Koch asked where King was, and Louis pointed toward the cold-storage area, but he did not say that Hall was with her. On cross-examination, the witness said that he saw Hall return from the cold-storage area and have a conversation with Michael Hughes. Hall then used the phone.

Odette Koch was a food supervisor assigned to the 1 p.m. to 9 p.m. shift in the upper dining room on the day King was murdered. She testified that she telephoned the kitchen area around 5:45 p.m. because she needed some peaches, and that inmate Derrick McGee answered the phone. She stated that McGee was unable to tell her the whereabouts of King, but McGee did tell her that there was in the kitchen a case of peaches which she could have for the upper dining room. She walked to the kitchen and encountered the defendant. The defendant, who appeared to the witness to be nervous and upset, told her that he had been cut and that he had tried unsuccessfully to get the assistance of a corrections officer. Koch and the defendant went to the door of the alleyway where Koch noticed that the door was unlocked. She became apprehensive because it was unusual for the door to be unlocked. Koch and Hall stopped at the door, and Hall showed Koch his hand, which was cut and dripping blood. At one point, the defendant ran into a bathroom adjacent to the kitchen. Koch became concerned about King, and she told a nearby inmate, whose name she

could not recall, to summon a corrections officer. An officer arrived soon after. On cross-examination, the witness said that while they were standing at the door of the alleyway, she asked the defendant where King was and he indicated towards the closet door in the alley. Hall told the witness that somebody on the other side of the door was holding King.

Lieutenant David Matsko was assigned to the lower dining room on February 8, 1983. He went to the kitchen area after Officer Tim Lovell requested his assistance. He saw the defendant near the door to the cold-storage area. The defendant told him that he was looking through the window on the door when an inmate jumped out and cut him with a knife. There was, the witness stated, "blood all over" the defendant's left hand and T-shirt. The witness did not see any other inmates in the area. The defendant twice ran into the bathroom and, while he was in there, Matsko heard water running.

Matsko stated that Koch told him that King was missing and, after ascertaining King was not in the upper dining room, Matsko used his radio to call for keys to search the storage area. He then escorted Hall to the prison hospital. On cross-examination, the witness said that he observed blood on "probably [a] quarter" of the front of Hall's shirt and blood on his pants near the pocket. He also related that while in the kitchen area he opened a locked wall safe where knives, screwdrivers, hammers and other tools were stored, and he noticed that a "scraper" was missing. The utensil was later established as the one found near King's body. He also identified a butcher knife that was discovered missing from a wall safe near the defendant's assigned desk outside Lieutenant Mundschenk's office.

David Metzger, a Department of Law Enforcement forensic scientist specializing in forensic serology, testi-

fied that he analyzed blood samples of the defendant and victim, and compared the results with his analyses of samples of blood found on the clothing each wore on February 8, and samples taken from certain areas of the inmates' kitchen. He concluded that bloodstains found on the defendant's hairnet were consistent with the victim's blood type and inconsistent with the defendant's. The same was true of bloodstains found on the defendant's lower left pants leg. Further, the witness was able to determine that the bloodstains were on the hairnet and pants "in the form of discrete droplets of flying blood and not the result of contact with an object that is already bloody as we might find in a smear or a swipe."

Blood of the type similar to that of the defendant's was found on the door handle of the bathroom, the floor of the bathroom, on the dividing wall near the west end of the kitchen, and on the floor of the cold-storage room. The defendant's blood was also found on the front of his shirt. However, Metzger testified that he was unable to determine if the victim's blood was also on Hall's shirt because the configuration of the two blood types was such that, when mixed, the defendant's blood type could be identified but not that of the victim. The witness examined the clothing of Eugene Davis, Edward Stokes and Felton Chase, but did not find bloodstains on any of their clothing. The clothing of Henry Dancy, also examined, contained some blood, but it was determined to be not of the defendant's or victim's type.

Investigating officers testified to statements made by the defendant after King's body was found. Michael Frazier, the security chief for the Pontiac institution, said that he talked to the defendant at 7 p.m. on the night of the murder. The defendant told Frazier that he had been looking for King when he was slashed by another inmate as he was opening a door to the cold-storage area. He identified a photograph of Eugene Davis as

the inmate who slashed him. Hall told Frazier that, after cutting him, Davis said that he had mistaken Hall for a food supervisor.

The next morning the defendant told Frazier that he saw King lying in a closet after Davis cut him, but before he could do anything Davis told him to run. The witness asked Hall if he knew the location of a set of missing keys, and Hall replied that, as he and Davis ran past a grease pan, the defendant heard a sound "like metal hitting metal." Frazier relayed this information to the watch commander present at the inmate kitchen and, 10 minutes later, Frazier was informed that the keys had been found in a grease pan.

Terrance Delaney, an agent with the Department of Law Enforcement, also interviewed the defendant on the day of King's death. In that interview, the defendant repeated that he had been cut by Davis when he was looking for King. The next day Delaney again talked to the defendant, and this time the witness asked Hall what his response would be if Delaney told him that his blood had been found in the oven room. Hall answered that after he had been cut and had tried unsuccessfully to get help from a corrections officer, he ran to the oven room to hide from the other inmates. Delaney testified that he asked the defendant in a later conversation to explain why the blood on his clothing matched that of the victim, and Hall replied that it only could have come from the knife that Davis used to cut him. Delaney asked his explanation of the defendant's fingerprints found in the area where King's body was discovered, and the defendant responded that he often stacked things in the cold-storage room. Delaney then pointed out to the defendant that he had not told Hall where King's body had been found.

A short time later, Hall asked to talk with Delaney. The defendant told him that Davis cut him while he was

looking for King. He told Delaney that he walked past Davis and saw King "quivering in a pool of blood" in the closet. He bent over her, but Davis told him to run. As he ran, the defendant heard the sound of metal hitting metal. When they ran into the kitchen area, Hall was confronted by inmates Stokes and Chase. Stokes told the defendant to hide in the oven room.

On March 11, 1983, Delaney was called to the defendant's cell in the north cellhouse segregation unit at Pontiac. Despite Delaney's warnings that he should not talk without his lawyer being present, Hall told Delaney that he knew what happened to King and to prove it he would tell Delaney something that no one else knew. He then told Delaney that, in addition to being stabbed, King had been choked.

Gary Neale Moore, a lieutenant at Pontiac, testified for the defense. He was with King at 5:30 p.m. on the day she was murdered. He said that he knew it was 5:30 because he was there when she answered a "security call-in" on the telephone, and that the security checks were made on the half-hour. Moore also testified that he found a 12-inch butcher knife hidden in a pan of pudding.

Corrections Officer Tim Lovell was assigned that day to guard the door leading from the kitchen area to the inmate dining room. He stated that the defendant approached him and said there was a "hit" out on the defendant, but the witness did not believe Hall. Lovell testified that later when he began looking for King, he saw Davis in the pot-and-pan area, but nowhere near the cold-storage area.

The defendant testified on his own behalf. He said that on that day other inmates had threatened to harm him. He unsuccessfully sought the aid of a corrections officer and then returned to the cold-storage area to find King because she was his friend and he knew that she

would help him. Contrary to the evidence introduced by the State, Hall said that all the doors in the kitchen area were unlocked and that inmates were able to move freely about the area. The defendant's search for King brought him to a vault room in the cold-storage area, where he found her calling in to see who was in the room. She told the defendant to go to the kitchen area and bring back a corrections officer, but the defendant refused because the inmates that were trying to harm him were in that area. She told him to use the phone to call for assistance.

At that point, inmate Eugene Davis rushed from the vault room, calling the defendant a "stool pigeon." Hall said that Davis was holding a knife, but King stepped between Davis and Hall and told Davis to put down the knife. As King came between the inmates, Davis grabbed her and stabbed her in the chest. King stumbled to the floor of the vault room as Davis continued to stab her. The defendant tried to disarm Davis, and it was then that his left hand was cut.

The defendant testified that Felton Chase and Edward Stokes, the inmates assigned to remove the garbage from the kitchen area, entered the kitchen. Stokes ordered Davis to stop stabbing King. As the defendant knelt over King, the other inmates told Davis to wash the blood off him and Davis ran to the bathroom. Davis came out of the bathroom and kicked the defendant as he was kneeling over King, then Davis slammed shut the door of the vault. Davis went back to the bathroom and returned with a mop, which he used in an attempt to clean the blood off the floor and from his shoes.

At Stokes' direction, the defendant ran to the oven area and hid. He approached Officer Lovell when he came in, but Lovell did not help him, so Hall went into the washroom and wrapped toilet paper around his hand.

On cross-examination, the defendant claimed that he

never made some of the statements which Delaney attributed to him. Hall did not tell the lieutenant the details of King's murder because he was afraid of retaliation against him and his family. He stated that he looked for King because she was his friend, but he admitted that he did not tell corrections officers who arrived at the kitchen the details of the attack on her even though he had just seen her alive on the closet floor. He acknowledged that he was left-handed.

On redirect examination, the defendant explained that the other inmates had threatened him because they had overheard him ask King if she had missed any keys after he noticed Davis in the storage area. King left to search for her keys, and inmate Chase asked the defendant what he had told her. Despite the defendant's denial, Chase stated that he knew the defendant was spying on people and that the defendant would be killed.

At the close of evidence the court found the defendant guilty of murder.

At the sentencing hearing before the court, the State introduced a copy of the defendant's birth certificate which showed that he was 24 years old on the date of the murder. The warden of Pontiac correctional institution at the time of King's murder, Kenneth McGinnis, testified that King was killed in the course of her duties at the institution.

Ron Umbdenstock, a captain at the Menard correctional institution, testified in aggravation that Hall was involved in an altercation while an inmate at Menard. Umbdenstock's testimony was that Hall held an inmate while two other inmates stabbed him, but that the victim was only slightly injured. Umbdenstock also said that Hall and his accomplices also tried to throw the man off the prison gallery. Hall had 10 months of "statutory good time" revoked because of the incident. On cross-examination the witness admitted that the report written

on the incident only charged the defendant with being involved in a fist fight.

The State introduced into evidence certified copies of the defendant's earlier convictions for rape, armed violence and two armed robberies. The State also presented the testimony of two of Hall's past victims. One testified that she was robbed and raped by Hall, and the other testified that Hall robbed and attempted to rape her.

The defendant introduced the testimony of Lloyd Shaddle, a Jehovah's Witnesses minister, who had conducted religious services for Hall while Hall was incarcerated. He said that Hall regularly attended bible study classes and that the defendant often expressed concern for his family.

The defendant testified in mitigation that his mother was 13 years old when he was born. He lived with his mother and his maternal grandparents until age 16, when he was first incarcerated. He has only been out of prison two years since his first incarceration. He married while an inmate in Pontiac, and he found the Jehovah's Witnesses faith in prison. He said that he completed work for his high school diploma by taking classes while at Menard.

Dr. Syed I. Ali, a psychiatrist at Pontiac called by defendant as a witness, testified that he saw and evaluated the defendant after the murder of King. He said that Hall was slightly above the average level of intelligence, and stated that the defendant was anxious and depressed about his pending sentencing.

After argument, the court made findings on factors in aggravation and found no factors in mitigation. The court sentenced the defendant to death.

The defendant first argues that the court erred in refusing to appoint new counsel after he struck attorney Skelton on the head with a chair. He says that his complaints about his representation which culminated in the

incident in the conference room were sufficient to establish a showing of "good cause," which he asserts is the statutory standard for the appointment of counsel other than the public defender (see Ill. Rev. Stat. 1971, ch. 38, par. 113—3(b); Ill. Rev. Stat. 1971, ch. 34, par. 5604). He contends that the court erred in failing to exercise its discretion to appoint new counsel (*People v. Slaughter* (1980), 84 Ill. App. 3d 88; *People v. Johnson* (1974), 24 Ill. App. 3d 152).

The provisions of section 113—3(b) of the Code of Criminal Procedure of 1963 and section 4 of the Public Defender Act, upon which the defendant relies, assure the right to counsel to an indigent defendant and, before amendment, provided the court authority to appoint counsel other than the public defender upon a showing of good cause. (Ill. Rev. Stat. 1971, ch. 38, par. 113—3(b); Ill. Rev. Stat. 1971, ch. 34, par. 5604.) However, effective October 1, 1977, Public Act 80—846 (1977 Ill. Laws 2495-96) changed the pivotal factor in the enactments from a showing of good cause to a finding by the trial court that "the rights of the defendant will be prejudiced by the appointment of the Public Defender." (Ill. Rev. Stat. 1983, ch. 38, par. 113—3(b); Ill. Rev. Stat. 1983, ch. 34, par. 5604. (Section 4 reads "the rights of the defendant *would* be prejudiced * * *." (Emphasis added.))) The defendant has mistakenly relied on a decision handed down before the statutes were amended (*People v. Johnson* (1974), 24 Ill. App. 3d 152), and on authority decided after the statutory changes but under the superseded language (*People v. Slaughter* (1980), 84 Ill. App. 3d 88, 93).

The appellate court in *People v. Clark* (1982), 108 Ill. App. 3d 1071, held:

> "[Section 113—3(b)] clearly states that the public defender shall be appointed as counsel for an indigent defendant unless such an appointment will prejudice the

rights of the defendant. Contrary to defendant's assertion, unless there is a determination that such prejudice will result, the court does not have discretion to appoint counsel other than the public defender." (108 Ill. App. 3d 1071, 1078.)

(See also *People v. Johnson* (1982), 109 Ill. App. 3d 511, 518; *People v. Woods* (1980), 84 Ill. App. 3d 938, 946.) The court in *Clark* contemplated the trial court's discretion only under section 113—3(b), but we consider that a showing of prejudice to the defendant's rights is also indispensable to a request that the court exercise its discretion and appoint private counsel under section 4 of the Public Defender Act (Ill. Rev. Stat. 1983, ch. 34, par. 5604).

Our review of the record shows that the defendant did not suffer prejudice to any of his rights by the public defenders' representation. A qualifying accused has, of course, the constitutional right to have counsel appointed, but that does not include the right to select counsel for appointment. (*People v. Lewis* (1981), 88 Ill. 2d 129, 160; *People v. Cox* (1961), 22 Ill. 2d 534, 537, *cert. denied* (1963), 374 U.S. 855, 10 L. Ed. 2d 1076, 83 S. Ct. 1925.) In addition, it is clear that an accused cannot exercise his right to the appointment of counsel to delay trial or impede the effective administration of justice. (*People v. Taylor* (1984), 101 Ill. 2d 508, 523; *People v. Friedman* (1980), 79 Ill. 2d 341, 349.) Here it is apparent that Ahlemeyer and Skelton performed competently before and during trial despite their unhappy position of being between the defendant's wish that they be discharged and the court's insistence that they remain as counsel. As early as the time of arraignment the defendant stated that he did not want representation by the public defender; yet he never presented an instance when his rights were prejudiced, despite ample opportunity to do so if prejudice existed. In the letters and mo-

tions concerning the defendant's discontent with Ahlemeyer, Hall made vague and unsubstantiated claims that "community ties" and a "reliance with the State's Attorney" would interfere with Ahlemeyer's representation of him. He complained of inadequate trial preparation by Ahlemeyer, yet he refused to meet with counsel to assist in the preparation of his defense. Hall refused the court's offer to appoint McLean County Public Defender Skelton to assist Ahlemeyer; he then asked that Skelton be appointed and soon after expressed his dissatisfaction with Skelton. The record clearly shows that the defendant embarked on a deliberate course designed to delay and disrupt his trial, and error cannot be reasonably found in the court's denial of a substitution of counsel. *Cf. People v. Taylor* (1984), 101 Ill. 2d 508, 523, and *People v. Myles* (1981), 86 Ill. 2d 260, 269-71 (defendant estopped from asserting ineffective assistance of counsel when claim arises from defendant's lack of cooperation).

After the defendant struck the judge and counsel in the conference room, he brought a motion for a mistrial and requested that the court, before ruling on the motion, question the jurors to determine if any heard the altercation. Hall's next contention is that he was unable to make a knowing or intelligent waiver of a jury at the guilt phase of his trial following the court's refusal to question the jury. He argues that it was impossible to ascertain whether the jury was prejudiced against him, and therefore he was deprived of a meaningful choice between a jury or bench trial. The State's response is that the defendant should not be permitted to create reversible error by his own misconduct.

In *United States v. Chaussee* (7th Cir. 1976), 536 F.2d 637, the Court of Appeals for the Seventh Circuit found no abuse of discretion when the district court denied a mistrial motion after the jury witnessed the defendant's unsuccessful attempt to escape. The court observed:

"Even though it may be a defendant's own misconduct which jeopardizes the fairness of his trial, the trial court, however, remains under a burden to use all reasonable means under the circumstances to insure a fair trial. That responsibility will require responses from the court tailored to the peculiar circumstances." 536 F.2d 637, 641.

Here the court found that at the time of the incident the door to the conference room was closed, that the jury was in the jury room under the control of a bailiff, that none of the jurors were in the corridor, and that none of the jurors witnessed the incident. We agree with the trial court's conclusion that "the integrity of the jury was intact." The trial court has broad discretion to determine the propriety of declaring a mistrial (*Illinois v. Somerville* (1973), 410 U.S. 458, 35 L. Ed. 2d 425, 93 S. Ct. 1066), and we judge that the court's denial of the request that the jury be questioned was proper.

Though, as we shall discuss later, the defendant stated that he did not want the judge to transfer the case to another judge for sentencing, he contends that he was denied a fair trial when Judge Caisley refused to transfer the case to another judge after he was struck by the defendant. Hall says that the judge was obligated to recuse himself if he believed that his impartiality might reasonably be questioned, or if the circumstances at trial created an appearance of bias. ABA Standards, Special Functions of the Trial Judge, Circumstances Requiring Recusation, sec. 6—1.7 (1986), ABA Code of Judicial Conduct sec. 3(C)(1)(1986); *People v. Wilson* (1967), 37 Ill. 2d 617.

The legislature provided for substitution of judges in section 114—5(c) of the Code of Criminal Procedure of 1963. (Ill. Rev. Stat. 1983, ch. 38, par. 114—5(c).) Section 114—5 creates an absolute right to substitute judges if the defendant's request is made within 10 days after his cause is placed on the judge's trial docket, but subsection

(c) states that, after the 10-day period, a "defendant may move at any time for substitution of judge for cause, supported by affidavit." (Ill. Rev. Stat. 1983, ch. 38, par. 114—5; *People v. Peter* (1973), 55 Ill. 2d 443, 458.) The burden of establishing cause under the section, we have held, rests with the defendant, and the trial court is not required to justify retaining the case. (*People v. Vance* (1979), 76 Ill. 2d 171, 178 citing *People v. Nickols* (1976), 41 Ill. App. 3d 974, 979.) The trial court is in the best position to determine whether it has become prejudiced against the defendant. 76 Ill. 2d 171, 178; *People v. Polk* (1973), 55 Ill. 2d 327, 336.

Judge Caisley, in denying the defendant's request that he recuse himself, stated:

"[T]he interest of proceeding to justice, the administration of justice[,] requires that there be a certain element of courage to go forward and to see that justice is fairly and impartially administered[,] and the fact that I have been struck by the defendant is a matter that is within his control but it is a matter within my control whether I allow that to prejudice me, and I have determined in my own mind that I shall not allow that to prejudice me in any way and that I will be completely fair and impartial in this case ***."

An examination of the record fails to show any unfairness to the defendant or want of even-handedness. The record confirms the assurances given by the court that it would provide Hall a fair trial. Hall, as stated above, has the burden of establishing cause under the section (*People v. Vance* (1979), 76 Ill. 2d 171, 178), and he has simply failed to meet that burden.

The actions of the defendant in striking his attorney and the trial judge were certainly outrageous and called for extraordinary detachment on their part. Despite the gravest of provocations the attorney and the judge, as we have observed, carried out their responsibilities with

professional competence and, considering the circumstances, even grace. We cannot presume a failure of impartiality of a trial judge even under extreme provocation. Judges are called upon to preside over the trial of onerous causes and persons. By definition, however, a trial judge is required to ignore provocations and pressures, whether public or from individuals. The record shows that the trial judge's conduct here was entirely proper. He correctly noted that the administration of justice requires the courage to insure that justice is fairly and impartially administered. The judge could easily have stepped aside without criticism and had the cause tried by another judge, even though it was predictable that a claim of double jeopardy might subsequently be raised. To hold that the law requires a substitution of judges under circumstances similar or comparable to those here would invite misconduct toward judges and lawyers, and a practice would develop that the grosser the misconduct the better the chances to avoid trial with an undesired judge or lawyer.

In a related argument, Hall contends that he was denied the effective assistance of counsel because his attorneys failed to file a written motion supported by affidavit for a substitution of judge under section 114–5(c). Specifically, the defendant argues that defense counsel "could easily have established the underlying facts of [the defendant's] attack on the judge by affidavits," which, the defendant says, would have been sufficient to establish cause under the section.

The court, however, was well aware of the factual basis underlying the request for recusal, heard extensive argument on the question, and carefully set out its reasons for denying the request. We fail to see how the motion's being in writing supported by affidavit could have had a different result. The Supreme Court has stated: "If it is easier to dispose of an ineffectiveness claim on

the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984), 466 U.S. 668, 697, 80 L. Ed. 2d 674, 699, 104 S. Ct. 2052, 2070; *People v. Del Vecchio* (1985), 105 Ill. 2d 414, 426.) Moreover, an attorney's performance will not be said to be deficient due to a failure to bring a futile motion. *People v. Kubat* (1983), 94 Ill. 2d 437, 485; *People v. Lewis* (1981), 88 Ill. 2d 129, 156.

The defendant's only challenge to the sufficiency of the evidence is in a *pro se* supplemental brief. He argues that circumstantial evidence, based in part on testimony of witnesses whose trial testimony contradicted earlier statements given to investigating officers, is insufficient to establish his guilt beyond a reasonable doubt. Hall observes that inmates Juan McGee and Derrick McGee each testified that the victim was last seen with the defendant near the cold-storage area and that Hall had blood on his shirt a short time later. He correctly points out that this testimony was inconsistent with the statements they gave corrections officers Russell Nelson and Herbert Givens the day after the murder. Juan McGee told Nelson and Givens that he did not know anything about King's death, and Derrick McGee refused to tell Nelson what he knew out of fear for his safety. Similarly, the defendant argues that inmate Ronald Louis lacked credibility because he testified that King never brought him the cheese he requested for the bacon sandwiches he was preparing, yet just after King's murder he told investigator David Brubaker that King had brought him the cheese. Hall also contends that Louis told Brubaker that he knew that the defendant had blood on his shirt from what another inmate had told him, yet at trial Louis insisted that he was testifying from his personal knowledge. Finally Hall challenges the time sequence constructed by the testimony of inmate Michael Hughes

because it was not consistent with that established by the testimony of Lieutenant Gary Neale Moore.

We first observe that a conviction can be sustained on circumstantial evidence, and the trier of fact is not required to disregard the inferences to be drawn from the evidence in order to find guilt beyond a reasonable doubt. (*People v. Albanese* (1984), 104 Ill. 2d 504, 514; *People v. Williams* (1968), 40 Ill. 2d 522, 526, *cert. denied* (1969), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004.) Too, the trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence; it is sufficient if all the evidence, taken together, satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *People v. Bernette* (1964), 30 Ill. 2d 359, 367.

Here the defendant asserts that certain testimony should be disregarded as incredible because the witnesses were impeached by prior inconsistent statements. However, he ignores the fact that each witness gave statements to investigating officers several months later that were consistent with their trial testimony, and that each explained that they were initially reluctant to cooperate with authorities because of fear of reprisal in the institution. Significantly, Hall does not challenge the testimony of the corrections officers who also placed him in the area just before the murder and also observed blood on his clothing just after King's disappearance became known. The defendant does not address the evidence of the victim's blood on his clothing; the testimony of Officer Delaney that the defendant alone knew King had been strangled; and Koch's testimony that Hall, in response to her question as to the whereabouts of King, indicated that she was in the closet near the cold-storage area. The defendant's theory that King was murdered by Davis was refuted in that there was no evidence that Davis ever left the kitchen area to go to the cold-storage

area or that he was with King around the time she was murdered. No blood was found on Davis. The defendant's attack on the credibility of four witnesses does not raise a reasonable doubt as to his guilt. This court will not reverse the trial court's determination of the credibility and sufficiency of the evidence unless the evidence is so improbable as to create a reasonable doubt of guilt. *People v. Davis* (1983), 95 Ill. 2d 1, 27; *People v. Novotny* (1968), 41 Ill. 2d 401, 412.

The defendant challenges his waiver of a jury at sentencing as improper. Just after the judgment of guilty was entered, the State reminded the court that it had requested a death penalty hearing under section 9—1(d) of the Criminal Code of 1961 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)), and asked that the defendant be directed to choose whether he wished to be sentenced by jury or to proceed to a hearing before the trial court. Defense counsel in response asked that a date be set for sentencing and assured the court that the defendant would make a decision before that date. The court said that a decision was needed that day because there were already impaneled "14 jurors who have been qualified." Defense counsel objected to that jury being used at sentencing, arguing that because they were discharged "there is no longer a jury in the case." The court ordered a recess until that afternoon.

Upon reconvening, the defendant was asked to state whether he wanted to be sentenced through a trial court hearing or by a jury. The defendant stated that he did not wish to be sentenced by a jury. The court admonished him that it would be charged with making findings of law and fact and that the court would determine his sentence. The defendant said that he understood and the court accepted his jury waiver.

On April 17, 1984, just as the sentencing hearing was to begin, the defendant asked that his waiver of a jury

be withdrawn because at the time he waived the jury he was unaware that to impose the death penalty the jury's decision had to be unanimous. The court, stating that the defendant had been instructed as to his rights under the sentencing provisions of section 9—1 (Ill. Rev. Stat. 1983, ch. 38, par. 9—1) and noting that a jury had already been discharged, held that the defendant could not at that point withdraw his waiver.

He argues that he did not knowingly or intelligently waive his right to a jury at sentencing because he was never admonished by the court or informed by counsel that a jury's decision to impose the death penalty must be unanimous. He cites *People v. Albanese* (1984), 104 Ill. 2d 504, 535, for the proposition that the sixth amendment requirement that a jury waiver be knowingly and intelligently made applies to the sentencing provisions of section 9—1(d) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)).

In *People v. Brownell* (1980), 79 Ill. 2d 508, 536, and in *People v. Albanese* (1984), 104 Ill. 2d 504, 535, this court declined to adopt a rule expressly requiring our trial courts to advise defendants at capital sentencing hearings of the unanimity-of-decision requirement before accepting a jury waiver. In *Albanese*, the court said that "the sixth amendment requires no precise formula for determining whether a waiver had been knowingly and intelligently made. Each case will turn on its own facts and circumstances." (104 Ill. 2d 504, 535-36.) (See also *People v. Madej* (1985), 106 Ill. 2d 201, 220-21; *People v. Taylor* (1984), 101 Ill. 2d 508, 520.) The record refutes the defendant's claim that he did not knowingly and intelligently waive a jury at sentencing. As early as the prosecution's opening statement, the defendant expressed a preference that the court determine his guilt or innocence, and, if necessary, determine his sentence. He said, "I don't want a jury, period, in any phase of this trial. I want to be dealt with by you [Judge Cais-

ley]." Advised by the court that a jury waiver for sentencing at that stage was premature, the defendant continued to insist that Judge Caisley preside at the sentencing hearing. He said that he did not want Judge Caisley to transfer sentencing to another judge because the defendant had struck Judge Caisley. Hall observed that he "would feel comfortable in knowing that [the court is] going to determine it all the way, if it does get there." (This is perhaps explained in the text of a letter addressed to Judge Caisley and made part of the record. The defendant observed in the letter that defense counsel had commented that Judge Caisley had the reputation of being opposed to the death penalty.) Too, before the court accepted the jury waiver it admonished Hall of his rights under the sentencing provisions of section 9—1(d) (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d)), informed him that it would consider the evidence presented at the hearing and that it would determine his sentence. The defendant stated that he understood his rights and the consequences of a jury waiver; the court accepted the waiver. It is apparent that the requirement that a jury reach a unanimous decision on the death sentence played no part in Hall's jury waiver, and we will not find error in the court's failure to admonish the defendant of the requirement.

We also note that there is a similarity between the case here and *People v. Albanese* (1984), 104 Ill. 2d 504, so far as the experience background of the defendants is concerned. In *Albanese* it was observed that the defendant, who had already been sentenced to death by jury for a related murder, was no doubt familiar with the function of a jury at a capital sentencing hearing. (104 Ill. 2d 504, 536.) Here, of course, while the defendant was faced with his first capital sentencing hearing, he had had the experience of four felony convictions. Two of these came through pleas and two through trials. It is

reasonable to conclude that the defendant was familiar with the nature of decision by jury.

Hall also contends that his jury waiver was not knowingly or intelligently made because, he says, it was premised on the erroneous ruling that the same jury that was dismissed before the start of evidence would be the jury used at the sentencing hearing if the defendant chose sentencing by jury. He argues that that jury does not fall within any of the following sentencing provisions of section 9—1(d) of the Criminal Code of 1961:

"The [sentencing] proceeding shall be conducted:
  1. before the jury that determined the defendant's guilt; or
  2. before a jury impanelled for the purpose of the proceeding if:
    A. the defendant was convicted upon a plea of guilty; or
    B. the defendant was convicted after a trial before the court sitting without a jury; or
    C. the court for good cause shown discharges the jury that determined the defendant's guilt; or
  3. before the court alone if the defendant waives a jury for the separate proceeding." Ill. Rev. Stat. 1983, ch. 38, par. 9—1(d).

As discussed above, it appears that Hall, as a tactical matter, chose to be sentenced by the court, and consequently it cannot be reasonably said that he based his jury waiver on a concern that the jury discharged earlier would determine his sentence. In any event, the record shows that the court never decided that the same jury would have sentenced the defendant.

The record shows that defense counsel objected to the use of the impaneled jury for sentencing, and the prosecution agreed that, if sentencing was to be by jury, defense counsel might want to raise "certain issues relative to the previous jury that [had] been selected." The prosecution pointed out that if the defendant chose to be

sentenced by the court, there would be no need to "argue the pros and cons" of using that jury. The court did not rule on the question and ordered a recess until that afternoon. Upon reconvening, there was no further discussion about whether the jury already impaneled could sit in determination of the defendant's sentence. No attempt was made to ascertain whether it was, in fact, the court's decision to use the same jury should the defendant elect sentencing by jury. Because the defendant did not obtain a ruling on the question, he cannot now complain that the court erred. (*People v. Mack* (1984), 105 Ill. 2d 103, 132.) Consequently, the contention that the defendant's jury waiver was not knowingly or intelligently made because it was premised on an "erroneous ruling" is untenable.

Hall also contends that the court improperly denied his motion to withdraw the jury waiver because it considered the fact that the jury had been sent home to be a crucial factor in denying his motion to withdraw the jury waiver. It is true that the court expressed its disapproval of the defendant's motion to withdraw the waiver made just moments before the sentencing hearing was to begin. However, it misrepresents the record to say that the court considered the fact that the jury had already been sent home as an influencing factor. The record reveals that the court reviewed circumstances surrounding the defendant's various demands that the trial proceed without á jury, paying particular attention to the defendant's waiver of a jury at sentencing, and concluded that a sentencing hearing before a jury was "a right he has knowingly and intelligently given up." The question of whether a jury waiver may be withdrawn rests within the discretion of the trial court unless the circumstances indicate the defendant was unaware of the consequences of the waiver. *People v. Catalano* (1963), 29 Ill. 2d 197, 202, *cert. denied* (1964), 377 U.S. 904, 12 L. Ed. 2d 176,

84 S. Ct. 1164; *People v. Jones* (1976), 42 Ill. App. 3d 353, 356.

Hall next argues that the court misconstrued our death penalty statute as precluding "an individual decision" on whether to impose the capital sentence. He claims the court resisted its personal inclination to show mercy in sentencing the defendant, and that therefore the death sentence was imposed contrary to the Supreme Court's decision under the eighth amendment that, because "the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases." *Lockett v. Ohio* (1978), 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965.

Upon the close of evidence and after hearing argument, the judge said he was faced with a choice between justice or mercy. The judge said, "If the choice were mine to make individually I would make a choice on the side of being merciful in sentencing this defendant to a term of life imprisonment." The judge observed, "I have taken an oath to administer the laws of the State of Illinois in a manner that I best can," and then sentenced the defendant:

> "I think all the aggravating factors are stacked against the defendant. I think there has been a complete absence of mitigating factors. I am persuaded there is no reasonable doubt here, and so it is my unhappy duty under the laws of the State of Illinois to sentence Anthony Hall to death."

Confronted with the most melancholy of all judicial responsibilities the trial judge, though his personal choice would have been to impose a sentence of imprisonment, imposed the sentence he concluded our law required.

Our death penalty statute mandates that the sentencing body consider "any mitigating factors which are rele-

vant to the imposition of the death penalty." (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(c); *People v. Madej* (1985), 106 Ill. 2d 201, 222.) This court has acknowledged that mercy is a relevant factor for consideration at a capital sentencing hearing, but it is to be considered within the context of all factors in aggravation and mitigation. (*People v. Holman* (1984), 103 Ill. 2d 133, 170.) Here the court stated that it considered all the evidence in aggravation and mitigation, but it said there was a "complete absence of mitigating factors," the presence of which would have enabled the court to show mercy and impose a sanction other than the death penalty. We cannot accept the defendant's contention that the court erroneously construed the statute to preclude considerations of mercy, but rather we believe that the court properly considered all factors in mitigation and aggravation before reaching judgment as to a sentence.

The defendant next complains that he was denied the opportunity to confront witnesses against him at sentencing when the court allowed into evidence the hearsay testimony of Ronald Umbdenstock, a correctional officer at Menard Correctional Center. Umbdenstock's testimony was that Hall and two other inmates at Menard were involved in a fight with another inmate in which the victim was stabbed. Hall and his accomplices, he said, attempted to throw their victim off the prison gallery.

Section 9—1(e) of our death penalty statute allows the introduction of evidence during the sentencing hearing that would not ordinarily be admissible during the guilt phase of a trial. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e); *People v. Lyles* (1985), 106 Ill. 2d 373, 414; *People v. Free* (1983), 94 Ill. 2d 378, 421-27.) The factors controlling the admissibility of evidence at a capital sentencing hearing are relevance and reliability, and the determination of admissibility rests in the discretion of the trial

court. (*People v. Eddmonds* (1984), 101 Ill. 2d 44, 65; *People v. Davis* (1983), 95 Ill. 2d 1, 43.) Hearsay testimony will not *per se* be deemed to be inadmissible at a sentencing hearing as denying a defendant's right to confront witnesses. *People v. Perez* (1985), 108 Ill. 2d 70, 86; *People v. Brisbon* (1985), 106 Ill. 2d 342, 365.

In *People v. Perez* (1985), 108 Ill. 2d 70, a corrections officer was allowed to testify at the sentencing hearing that he had been cautioned by his superior that he should be careful around the defendant. The superior officer had been informed by an inmate that the defendant had threatened to harm the witness. We held the hearsay testimony to be relevant as an aggravating factor because it tended to establish that the defendant was a threat to the safety of others. We said the evidence was reliable because it was corroborated by the witness' testimony that the defendant had also directly threatened him. (108 Ill. 2d 70, 85-87.) Just as in *Perez,* we consider the testimony that Hall had exhibited violent and criminal behavior while incarcerated at Menard to be relevant as an aggravating factor. Further, we do not question the reliability of the testimony because the defendant did not claim at trial that the incident did not occur, nor did he deny that sanctions were imposed at the disciplinary proceeding that resulted from the incident. In fact, it was during the defendant's cross-examination of the witness that it was brought out that the defendant lost 10 months of "good time" because of his involvement. See also *People v. Brisbon* (1985), 106 Ill. 2d 342 (hearsay testimony that the defendant had been charged in an earlier murder, but that the charges were dismissed for want of probable cause, admissible at sentencing hearing as relevant to defendant's unprosecuted misconduct).

The defendant complains of an improper remark in the State's closing argument. He says that the prosecution attempted to appeal to the emotions of the court

when it argued:

> "Your honor, on behalf of the People of the State of Illinois and Livingston County, the director and staff and personnel of the Department of Corrections, I am asking you to let, in this case, the punishment fit the crime and there is only one avenue left based on the statutory considerations and based on the serious and heinous nature of this case and that is for the court to set an execution date."

Hall asserts that the reference to employees at the Department of Corrections was an improper appeal to emotion condemned in *People v. Szabo* (1983), 94 Ill. 2d 327, 363-67. Hall, in support of his argument that the court was improperly influenced at sentencing, submits that unsolicited letters, sent to the court by personnel of the Centralia Correctional Center, which asked that the defendant be sentenced to death also were an appeal to the court's emotions.

The State correctly notes, however, that the defendant's failure to object to the remark in closing argument served to waive consideration of the question on appeal. (*People v. Lewis* (1981), 88 Ill. 2d 129, 149; *People v. Carlson* (1980), 79 Ill. 2d 564, 575-78.) Apart from the waiver, we judge on the merits that a new sentencing hearing is not required. We would consider it unrealistic to say that the prosecutor's remark and the unsolicited letters affected the experienced trial judge's decision to impose the death penalty.

The focus of a capital sentencing hearing is on the character and record of the defendant and the facts and circumstances of the crime. While remarks by the prosecutor which are so prejudicial that they serve to divert the attention of the sentencing body from the offender and the crime are improper (see *Woodson v. North Carolina* (1976), 428 U.S. 280, 304-05, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *Lockett v. Ohio* (1978), 438 U.S.

586, 604-05, 57 L. Ed. 2d 973, 989-90, 98 S. Ct. 2954, 2964-65; *People v. Walker* (1982), 91 Ill. 2d 502, 515), one cannot reasonably say that the reference to personnel at the Department of Corrections would divert the attention of the court from a proper consideration of the evidence. Too, we find no prejudicial error in the letters sent by personnel of the Centralia Correctional Center. The court advised defense counsel of the letters and specifically stated that it was not considering the contents of the letters in its deliberations. A trial court will be presumed to have considered only proper evidence and to have disregarded inadmissible evidence in reaching its conclusions (*People v. Harris* (1974), 57 Ill. 2d 228, 231; *People v. Wallenberg* (1962), 24 Ill. 2d 350, 354), and there is nothing in the record to rebut the presumption that the court considered only properly admitted evidence in sentencing the defendant to death.

The defendant's final allegation of error at his sentencing is that the court improperly considered as an aggravating factor the fact that there can truly be no compensation for a murder victim or the survivors. The court had stated that "it would be impossible to compensate anyone for the loss of their life or to compensate members of the family." If, as the defendant claims, the court considered the impossibility of compensation as an aggravating factor, we do not consider that it was a significant factor in light of the court's recital of aggravating factors. The court noted that the defendant had to have "contemplated" the murder because he carried the knife to the cold-storage area; that the number of wounds was evidence that his victim suffered a brutal death; that Hall used his assignment in the inmate kitchen to commit the murder; and that the defendant has a substantial prior history of criminal conduct.

Finally, the defendant presents a number of constitutional challenges to this State's death penalty statute

which have already been considered and rejected. This court has held that the statute does not allow unbridled or unguided discretion to the prosecution in deciding whether to seek imposition of the death penalty. (*People v. Free* (1986), 112 Ill. 2d 154, 162; *People v. Lewis* (1984), 105 Ill. 2d 226, 252; *People v. Kubat* (1983), 94 Ill. 2d 437, 501; *People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603.) It has been decided that the statute does not arbitrarily or capriciously limit imposition of the sentence to certain defendants (*People v. Walker* (1985), 109 Ill. 2d 484, 509; *People v. Stewart* (1984), 104 Ill. 2d 463, 499-502) and does not impose on the defendant the burden of proving that the death penalty was inappropriate (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 446; *People v. Albanese* (1984), 104 Ill. 2d 504, 541-42; *People v. Brownell* (1980), 79 Ill. 2d 508, 538). The prosecution is not constitutionally limited to aggravating evidence which has been disclosed to the defendant prior to trial, nor is the sentencing body constitutionally required to specify in writing the aggravating factors upon which the death sentence was based (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-41). The sentencing body must, however, determine that the aggravating factors exist beyond a reasonable doubt (*People v. Free* (1983), 94 Ill. 2d 378, 427, *cert. denied* (1983), 464 U.S. 865, 78 L. Ed. 2d 175, 104 S. Ct. 200). The contention that a statute is constitutionally infirm because it fails to provide for comparative review of capital cases has been rejected. *Pulley v. Harris* (1984), 465 U.S. 37, 47-48, 79 L. Ed. 2d 29, 39-40, 104 S. Ct. 871, 879; *Jurek v. Texas* (1976), 428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958; *People v. Walker* (1985), 109 Ill. 2d 484, 508; *People v. Stewart* (1984), 104 Ill. 2d 463, 499; *People v. Silagy* (1984), 101 Ill. 2d 147, 161; *People v. Williams* (1983), 97 Ill. 2d 252, 266.

For the reasons given, the judgment of the circuit court of McLean County is affirmed. The clerk is ordered to enter an order setting Tuesday, the 20th day of January, 1987, as the date on which the sentence of death, entered by the circuit court of McLean County, shall be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, par. 119—5). A certified copy of the mandate in this case shall be furnished by the clerk of this court to the Director of Corrections, to the warden at Stateville Correctional Center and to the warden of the institution wherein the defendant is confined.

*Judgment affirmed.*

JUSTICE SIMON, concurring in part and dissenting in part:

I would affirm the defendant's conviction.

So far as the death sentence is concerned, it is quite clear that the trial judge believed that he was precluded from considering mercy in determining whether to impose the death penalty. Equally clear is that his decision would have been different had he considered mercy. He said: "If the choice were mine to make individually I would make a choice on the side of being merciful in sentencing this defendant to a term of life imprisonment." The judge apparently regarded this choice as foreclosed, however, by his oath to administer the laws of the State. Under this view of the law, he found that "there has been a complete absence of mitigating factors" and so imposed the sentence of death.

As the majority acknowledges, mercy is a relevant factor in mitigation at the death penalty hearing. (114 Ill. 2d at 416; *People v. Holman* (1984), 103 Ill. 2d 133, 170.) Had a jury deliberated on the sentence, the death penalty could not have been imposed if a single juror be-

lieved that mercy was appropriate in the circumstances. The circuit judge was therefore mistaken in thinking that mercy could not enter into his determination. The majority's conclusion that the judge "properly considered all factors in mitigation and aggravation" (114 Ill. 2d at 416) cannot be squared with the judge's own explanation of his decision. Since his finding that there were no factors whatever in mitigation was clearly founded upon an incorrect understanding of the law, the sentence should be vacated.

An independent reason why this death sentence cannot stand is that the defendant was never admonished prior to waiving a jury for sentencing that such a jury would have to be unanimous in order to impose the death penalty. As I have stated before (*People v. Buggs* (1986), 112 Ill. 2d 284, 296 (Simon, J., specially concurring); see also *People v. Morgan* (1986), 112 Ill. 2d 111, 150 (Simon, J., dissenting)), fundamental fairness dictates that trial judges correctly admonish capital defendants as to the unanimity rule. In *Buggs* and *Morgan* the court rejected the contention that a proper admonition on unanimity was a prerequisite to a knowing and intelligent waiver of a sentencing jury, and relied on the fact that the defendants in those cases had conferred with counsel prior to tendering their waivers. (*People v. Buggs* (1986), 112 Ill. 2d 284, 293; *People v. Morgan* (1986), 112 Ill. 2d 111, 141.) Here, though, the defendant stated to the judge prior to the commencement of the sentencing hearing that counsel had not informed him of the unanimity requirement. The court's disposition of this issue appears especially indefensible in this case because the defendant actually tried to retract his waiver prior to the sentencing hearing. It cannot therefore be said that he was waiting to see what sentence the judge would impose before challenging the voluntariness of his jury waiver.

In support of its decision that the defendant's waiver was knowing and intelligent, the majority finds it "reasonable to conclude that the defendant was familiar with the nature of decision by jury" because of his prior felony convictions (114 Ill. 2d at 413). But the "nature" of the decision by a capital sentencing jury differs from that of an ordinary trial jury, with which the defendant had some previous experience, on the very point at issue here: the consequence of a single juror dissenting. In a felony trial, if one juror votes not guilty, the defendant is not acquitted, but a mistrial is declared and the prosecution can start over with a new jury. A single capital sentencing juror voting against the death penalty results, however, in the defendant's "acquittal" of the death sentence (see *Poland v. Arizona* (1986), 476 U.S. 147, 153, 90 L. Ed. 2d 123, 131, 106 S. Ct. 1749, 1754). Far from providing any meaningful basis for the decision whether to waive the jury for sentencing, the defendant's prior experience with the jury system may actually have misled him on the consequences of a lack of unanimity. This case therefore bears no similarity to *People v. Albanese* (1984), 104 Ill. 2d 504, in which the defendant had previously been sentenced to death by a jury in a related case before tendering the sentencing jury waiver at issue there.