THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
MICHAEL MIGLIORE, Defendant-Appellant.

Second District    No. 2—87—0611

Opinion filed June 8, 1988.

Terry L. Deck, of Rockford, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE REINHARD delivered the opinion of the court:

Defendant, Michael Migliore, was found guilty in a bench trial in the circuit court of Winnebago County of the offense of attempted murder (Ill. Rev. Stat. 1985, ch. 38, par. 8—4) and was sentenced to a 10-year term of imprisonment.

On appeal, defendant contends that (1) the evidence failed to prove that his actions constituted an attempt to kill, (2) the State failed to prove its theory of transferred intent, (3) the evidence was insufficient to prove him guilty beyond a reasonable doubt of attempted murder, and (4) the trial court abused its sentencing discretion in imposing a 10-year term of imprisonment.

Defendant and a codefendant, David Krueger, were charged in an indictment with committing the offense of attempted murder of

Dominic Iasparro on September 11, 1986. The codefendants were tried separately. At defendant's trial, the State adduced evidence that, on the evening of September 11, 1986, defendant, Krueger, and Krueger's wife, Christine, were at Tom's Tap in Rockford at 9 p.m. during a lunch break on Christine's work shift at Amerock Corporation. Christine related that during their conversation, defendant stated that Bill Knight said something that day about burying him and his Cadillac with his two Budweiser cans. After leaving the tavern, defendant and Krueger dropped Christine off at work and drove off in her car.

Bill Knight, an attorney in Rockford, represented a client who was previously injured in an automobile accident with defendant. Defendant had been charged with leaving the scene of an accident involving personal injury or death. At the preliminary hearing on that charge, held on September 11, 1986, Knight attended and gave defendant and his attorney Knight's professional card and introduced himself. Knight testified that there was no other conversation and that he sat next to defendant for awhile during the hearing. Becky Knight, the former wife of attorney Knight, who worked as an investigator and photographer for attorney Knight, was also present at the preliminary hearing and sat next to defendant at some point. She tried to take defendant's photograph outside the courtroom, and defendant was pushed away by his father and friends to avoid being photographed. She had no conversation with defendant. Attorney Knight lives at 1205 Lundvall Avenue in Rockford.

Dominic Iasparro lives at 1311 Lundvall Avenue, which is about one block from attorney Knight's house. He is a police officer for the City of Rockford and was not acquainted personally or professionally with defendant or David Krueger. At approximately 10 p.m. on September 11, 1986, Iasparro was at home watching television in the front living room with his wife when he heard a car with loud mufflers pass his house two or three times. He thought the car slowed down the last time, and he went to the front door. He looked out a window in the top of the door and observed a car containing two males parked near the curb. The person on the passenger side, later identified by Iasparro as Krueger, left the car and walked up Iasparro's front lawn to his front porch. Iasparro turned on the porch light and opened the door. Krueger turned and ran back to the car, which was driven off at a high rate of speed with its lights off. A neighbor of Iasparro's testified that he observed the car stop in front of Iasparro's house and saw a person get out of the car, approach the house, and return to the car. He heard the person say "That's the fel-

low" or "That's the guy" when he returned to the car.

Other evidence established that, on September 11, 1986, at between 10 p.m. and 10:30 p.m., defendant and Krueger went to the Surf Lounge in Rockford. Each consumed several beers. They were loud and having a good time. They left the bar at about 11:15 p.m.

At approximately 11:40 p.m., Iasparro was still watching television in his front living room. As he was walking back to the couch, after changing the stations on the television set, he heard what sounded like the same car with the loud mufflers that he had heard earlier. At that time, he was in front of the front window with his back turned to the window. He heard one gunshot and then he heard a rapid series of six to eight gunshots, some of which hit his house. No one was injured, and Iasparro did not see the car or anyone who had done the shooting.

Testimony established that eight slugs hit Iasparro's house. An impact slug was found in the driveway, which was located to the west of the picture window. A slug had hit the house just to the west of the railing on the front porch and two others hit the steps of the front porch. A fifth bullet was found lodged in the upper portion of the wooden front door. Another hit the lower portion of the master bedroom window which is located directly to the east of the front door, and three others impacted the house to the east of the bedroom window. The front picture window is located immediately to the west edge of the front porch and is set in several feet from the front door. A fairly large bush, between 4 and 4½ feet high, stands in front of Iasparro's home and blocked a portion of the picture window.

At about 12:13 a.m. on September 12, 1986, a Winnebago County sheriff's deputy was dispatched to the 400 block of Marquette Street in Machesney Park, adjacent to Rockford, for a possible burglary in progress. As the deputy turned onto Marquette Road, he noticed a vehicle with its lights off, moving slowly, which he stopped. The passenger, defendant, got out of the car and walked around to the rear. Defendant was repeatedly told to remain in the car, but he got nasty and began yelling profanities. The driver, Krueger, was told to step out of the car. The deputy then noticed a shotgun in two or three pieces on the rear seat of the vehicle. The deputy removed several open and several sealed cans of beer from the car as well as the dismantled shotgun. He also noticed that defendant's breath smelled of alcohol.

Another sheriff's deputy, who assisted in the arrest of the two individuals, searched the vehicle and recovered, among other things, two spent nine-millimeter "Para Geco" casings from the floorboard of

the rear seat.

At approximately 1 a.m. on September 12, 1986, Iasparro was summoned to the Machesney Park location. He stated that the car, which had been started, sounded like the same car that was in front of his residence around 10 p.m. and, again, at 11:40 p.m. Further, the car appeared to be the same size and color as the one he had seen. At that time, Iasparro also recognized Krueger to be the man who had come to his door at 10 p.m. that night.

Six nine-millimeter Para Geco shell casings were recovered on the street in front of Iasparro's house. Three or four bullet slugs or fragments were recovered from the area in front of Iasparro's home, including one that had been taken from the front door of the home. A search of defendant's home revealed another 11 nine-millimeter Para Geco shells.

The owner of Madison's Gun Shop, located in nearby Loves Park, Illinois, stated that his records indicated that he had sold a nine-millimeter pistol to defendant on January 26, 1986. Terrence Dahm, a Rockford city police officer assigned to the identification unit, testified that, on September 12, 1986, he and his partner were directed to proceed to an address at 36 Marquette Road in Machesney Park, Illinois, near the location of defendant's arrest, where they uncovered various packages that had been buried under approximately six inches of dirt. These packages were sent directly to the State Crime Laboratory in Joliet, Illinois, in that condition. Walter Sherk, a firearms and tool marks expert with the Illinois State Police Department at the State Crime Lab Facility in Joliet, Illinois, testified that he ran ballistics examinations of various cartridge cases recovered from the vicinity of the Iasparro home, in addition to those recovered in the car in which defendant was seated when stopped, and determined that they all had been fired from the same weapon. Sherk also performed ballistics examinations on the nine-millimeter semiautomatic pistol and magazine clip that he received in the various unwrapped packages and certain of the bullets recovered by police during the course of their earlier investigation and determined that they had been fired from that pistol.

Defendant presented no evidence on his own behalf, and, following closing arguments, the trial court found defendant guilty of attempted murder.

Defendant first contends that the evidence was insufficient to prove that his actions constituted an intent to kill. He maintains that this argument is supported by the evidence, which shows that (1) the gunshots, which never entered Iasparro's home or struck anyone,

were fired from the street by an occupant of a moving car who obviously did not aim the weapon, (2) the pattern of the bullet marks on the house indicates that the person standing in the picture window was not targeted for killing, the closest bullet impact being around the front door and not the picture window, (3) no person tried to forcibly enter Iasparro's house, and (4) the internal illumination of the house was insufficient to identify clearly any person standing behind the front picture window.

The State contends that intent can rarely be based on direct evidence and may be shown through surrounding circumstances, such as the character of the assault and the use of a deadly weapon. The State points to the fact that defendant fired nine shots from a nine-millimeter semiautomatic weapon, eight of which hit Iasparro's home, that the shooting began when Iasparro was standing three to five feet from his front window, and that the shots were fired at a level calculated to kill, not scare, someone. The State asserts further that the accuracy of defendant's aim is irrelevant and that Christine Krueger's testimony and other evidence regarding attorney Knight's interaction with defendant at the preliminary hearing earlier on the day of the shooting was indicative of defendant's intent prior to the shooting.

■■ In order to sustain a conviction for attempted murder, the prosecution must prove that defendant had the intent to kill the victim. (*People v. Mitchell* (1984), 105 Ill. 2d 1, 9, 473 N.E.2d 1270; *People v. Roberts* (1979), 75 Ill. 2d 1, 8, 387 N.E.2d 331.) The specific intent to kill, if not admitted, may be shown by surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other circumstances. (*People v. Koshiol* (1970), 45 Ill. 2d 573, 578, 262 N.E.2d 446; see *Mitchell*, 105 Ill. 2d at 9, 473 N.E.2d at 1274.) Such intent may be inferred if one wilfully does an act, the direct and natural tendency of which is to destroy another's life. (*People v. Coolidge* (1963), 26 Ill. 2d 533, 537, 187 N.E.2d 694.) It is the function of the trier of fact to determine the existence of the requisite intent, and that determination will not be disturbed on review unless it clearly appears that there exists a reasonable doubt as to the defendant's guilt. *People v. Winters* (1986), 151 Ill. App. 3d 402, 406, 502 N.E.2d 841.

We consider the remarks of the trial judge, in rendering his decision, to be particularly instructive regarding his finding of the intent to kill. The judge stated, in pertinent part, as follows:

"I conclude from the evidence that the Defendant and one Krueger drove by the residence of Iasparro on the night in question and one or both of them using the Defendant's

weapon fired that weapon from a moving vehicle in the direction of the Iasparro house. How that came about is the next inquiry.

It was obviously no accident. With what intention was this done we don't—we don't have a statement from any of the participants as to the intentions in the mind of either occupant of that car. We must infer those things that are not specifically before the Court in the way of physical testimony and evidence from that testimony and evidence.

I have come to the conclusion that there are two hypothesis [*sic*] in this case and one is that the Defendant and Krueger drove back to that location with the gun loaded and aimed for the picture window silhouetted in the light intending to kill that person but missed through inaccuracy occasioned by either the nature of the gun, a semi-automatic, the fact that they were in a moving car or diminished ability of the operator of the gun to aim it because of drinking or otherwise. The other hypothesis is that the Defendant and Krueger were driving by in their car, never intended to aim at the picture window at the silhouette.

From the evidence it appears to me that the occupant of the house, the complaining witness here was already on his feet when the car approached. The occupants of the car knew from previous experience that very same evening that without any more stimulus than the car driving by with a muffler, a loud muffler, the occupant of that house had left whatever he was doing and had come to the door and flashed the light on. Nothing that that occupant had done with only that stimulus earlier in the evening I hypothesize that the Defendant and his companion expected the individual they saw already on his feet in that living room which was a few short steps from the front door to come to the front door in response to the same stimulus, the loud muffler and that they, indeed, fired this weapon at the front door and it appears clear to me from the evidence that not only were the cluster of bullets where they struck bracketing the front door upward and downward and on either side but that the bullets were at levels that would be calculated to kill somebody who came to the front door, both the bullets to the right of the door and the bullets that clipped off the ledge on the bedroom to the left of the door.

I also am mindful of the fact that many of these photographs do not show the perspective that those operating a motor vehicle driving by would have had and it appears to me

from the evidence that from the time the occupants of a motor vehicle was [*sic*] somewhat west of the premises until they were somewhat east of the premises they would have had a good view of the entire front of the house with the exception of that shrubbery immediately in front of the house which, however, was not high enough to conceal either the picture window, the door or the bedroom window to any extent.

Again the fact that the bullets did not enter the front door at mid-level can easily be attributed to the inaccuracy of that kind of a gun, the fact it was fired from a moving vehicle and again the condition of the occupants of the car. Under either hypothesis I have no doubt from the evidence that the Defendant intended to kill the occupant, whoever that occupant was, and it is a matter of no moment to me that the occupant was Iasparro and not Knight nor is it essential to the decision in this case. Accordingly having considered all the evidence and the arguments of counsel the Court finds the Defendant guilty of the crime charged."

■ We agree with the trial court's analysis of the evidence and conclude that the State proved the requisite state of mind to sustain the attempted murder conviction. In addition to the trial judge's comments on the evidence, the record discloses that Krueger said "[t]hat's the guy," after the first incident at the home at 10 p.m. This fact, coupled with the earlier events that day involving attorney Knight in court, Knight's former wife's attempt to take defendant's photograph, and the return of defendant and Krueger to perform the shooting, further show their intent to do deadly violence to someone whom they apparently believed was acting against defendant in the criminal prosecution pending against him. The shots were fired either at the door where Iasparro had previously appeared or at both the door and the nearby picture window, albeit slightly inaccurately at the window, where Iasparro was silhouetted. We are satisfied on this record that the intent to kill was shown by the surrounding circumstances of this assault.

■ Defendant next contends that the prosecutor indicated in his opening statement that the State would prove that attorney Knight was the target of defendant's action. Defendant argues that the prosecutor's statement committed the State to proving, under the doctrine of "transferred intent," that the intended victim of the shooting was attorney Knight, and that he did not prove that fact. Thus, defendant maintains that the State, first, failed to prove that he intended to kill the person named in the indictment, Iasparro, and, sec-

ond, failed to prove that he intended to kill attorney Knight.

The State responds that the concept of transferred intent is not an element of attempted murder. It also emphasizes that it could not find, and defendant fails to cite, authority which requires the State to prove that defendant attempted to kill someone other than the victim. The State argues that it need only prove beyond a reasonable doubt that defendant had the specific intent to take a human life, and that it is not necessary to prove that defendant had a specific intent to kill a person other than the person at whom defendant shot. The State argues further that the evidence regarding Knight was introduced to explain or show a motive for the offense and to show that defendant had an intent to kill, even though he had a mistaken impression that Iasparro was Knight.

What defendant has referred to as the doctrine of "transferred intent" is a rule in Illinois that where a person shoots at one and in the direction of another, with intent to kill, but kills or injures the other, he may be convicted of the crime of murder or attempted murder of the unintended victim. (*People v. Marshall* (1947), 398 Ill. 256, 263, 75 N.E.2d 310; *People v. Cohen* (1922), 305 Ill. 506, 512, 137 N.E. 511; see *People v. Forrest* (1971), 133 Ill. App. 2d 70, 71-73, 272 N.E.2d 813.) Section 9—1 of the Illinois Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) provides, in part, as follows:

> "(a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
>
> (1) He either intends to kill or do great bodily harm to that individual *or another*, or knows that such acts will cause death to that individual or another; ***." (Emphasis added.)

The committee comments to this section of the Code state:

> " 'Or another' recognizes the established principle often described as 'transferred intent': if the offender has the mental state which characterizes murder, he is guilty of murder even if the person whom he kills is not the one whom he intended to kill. (Discussions of this principle appear in Wharton, 'Law of Homicide' (3rd ed.) 108-10; Moreland, 'Law of Homicide,' 19-20; Report of New York Law Revision Commission, 1937, 613-16; Annotation, 18 A.L.R. 917 (1922))." (Ill. Ann. Stat., ch 38, par. 9—1, Committee Comments, at 18 (Smith-Hurd 1979).)

The factual context of the reported Illinois cases on transferred intent all involve an unintended victim of an intentional crime, a bad-aim type of situation. (See, *e.g.*, *People v. Marshall* (1947), 398 Ill. 256, 75 N.E.2d 310; *People v. Cohen* (1922), 305 Ill. 506; 137 N.E. 511; *People*

*v. Forrest* (1971), 133 Ill. App. 2d 70, 272 N.E.2d 813.) Defendant here, however, is charged with the attempted murder of Dominic Iasparro, and there are no allegations or proof that defendant attempted to kill someone else and missed. While the evidence did tend to show that defendant may have had a possible motive to kill someone else, namely attorney Knight, any possible mistake in the intended victim does not negative his intent to kill Iasparro. The evidence supports the allegation that the shots fired by defendant or his codefendant, Krueger, intended to kill Iasparro, and the State need not prove motive as it is not an element of the offense. See *People v. Mangano* (1940), 375 Ill. 72, 76, 30 N.E.2d 428.

Where a defendant is charged with attempted murder, it must be proved that he acted with intent to kill the victim and that he took a substantial step toward the commission of the crime. (*People v. Shum* (1987), 117 Ill. 2d 317, 344, 512 N.E.2d 1183; Ill. Rev. Stat. 1985, ch. 38, par. 8—4(a).) A conviction for attempted murder must be based on a charge and upon evidence that defendant had the intent to take a life. See *People v. Trinkle* (1977), 68 Ill. 2d 198, 203, 369 N.E.2d 888.

As discussed earlier, the proofs here were sufficient to show an intent to kill Iasparro, and the material allegations of the indictment were proved beyond a reasonable doubt. (*Cf. People v. Forrest* (1971), 133 Ill. App. 2d 70, 72-73, 272 N.E.2d 813.) While it is possible that defendant may have intended to kill attorney Knight, as there was no known reason that Iasparro could attribute to defendant's and Krueger's assault on him, any mistaken identity situation does not negative the intent to kill. Even if the attempted murder of Iasparro was a mistake, defendant intended to kill the person he aimed at, namely Iasparro. Mistaken identity does not negative an intent to kill, as pointed out by Professors La Fave and Scott in their works entitled Substantive Criminal Law, as follows:

"The situation, discussed above, concerning the unintended victim of an intentional crime—which we have referred to for short as the bad-aim situation—is to be distinguished from an entirely different unintended-victim case—the mistaken-identity situation—which is governed by a quite separate set of legal rules. Thus in the semi-darkness *A* shoots, with intent to kill, at a vague form he supposes to be his enemy *B* but who is actually another person *C*; his well-aimed bullet kills *C*. Here too *A* is guilty of murdering *C*, to the same extent he would have been guilty of murdering *B* had he made no mistake. *A* intended to kill the person at whom he aimed, so there is even less difficulty in holding him guilty than in the bad-aim situa-

tion. And of course *A*'s conceivable argument that his mistake of fact (as to the victim's identity) somehow negatives his guilt of murder would be unavailing: his mistake does not negative his intent to kill; and on the facts as he supposes them to be *A* is just as guilty of murder as he is on the facts which actually exist." 1 W. La Fave & A. Scott, Jr., Substantive Criminal Law §3.12, at 402 (1986).

For the foregoing reasons, we reject defendant's contentions that the State failed to prove an intent to kill Iasparro.

Defendant next contends that, because the State failed to show any participation in the shooting on his part or any connection between him and the gun used in the shooting, the evidence was insufficient to convict him of attempted murder. Defendant emphasizes that the evidence only established that he was with Krueger up until 9:33 p.m. on September 11, 1986, when they dropped Christine Krueger off at work and, then, again at 12:15 a.m. on September 12, 1986, at the time of their arrest in Machesney Park. Further, while defendant was shown to have purchased the firearm allegedly used in the shooting, the State only produced evidence that the weapon was uncovered on the evening of September 12, 1986, in the backyard of a home located at 36 Marquette Road. No evidence was produced regarding who owned the residence or defendant's responsibility for burying the weapon. Additionally, defendant asserts that because the State's ballistics expert could not state exactly when the two nine-millimeter cartridges which had been fired from the weapon were fired, the mere presence of the cartridges in the car when defendant and Krueger were stopped does not establish that they had been fired earlier that evening. Defendant argues that due to the highly circumstantial nature of the evidence against him, the proofs were not so conclusive that the trial court should have been convinced, to a reasonable and moral certainty, that defendant and no one else committed the crime.

The State responds that the trial court, here, relied on a chain of circumstances that was so strong and convincing that defendant was properly found guilty beyond a reasonable doubt.

■ A conviction can be sustained on circumstantial evidence, and the trier of fact is not required to disregard the inferences to be drawn from the evidence in order to find guilt beyond a reasonable doubt. (*People v. Hall* (1986), 114 Ill. 2d 376, 409, 499 N.E.2d 1335.) The trier of fact does not have to be satisfied beyond a reasonable doubt as to each link in the chain of circumstantial evidence; it is sufficient if all the evidence, taken together, satisfies the trier of fact be-

yond a reasonable doubt of the defendant's guilt. (*Hall*, 114 Ill. 2d at 409, 499 N.E.2d at 1348.) While the distinction between direct and circumstantial evidence is often difficult to draw (see *People v. Bryant* (1986), 113 Ill. 2d 497, 508, 499 N.E.2d 413), we shall assume for the purposes of review that the State's evidence was circumstantial. (See *People v. Crow* (1985), 108 Ill. 2d 520, 532-33, 485 N.E.2d 381.) Once a defendant has been found guilty of the crime charged, the fact finder's role, as weigher of the evidence, is preserved through a legal conclusion that, upon judicial review, all of the evidence is to be considered in the light most favorable to the prosecution. *People v. Collins* (1985), 106 Ill. 2d 237, 261, 478 N.E.2d 267.

■ The record reveals that in light of the evidence, taken together, defendant was guilty of attempted murder beyond a reasonable doubt. Iasparro heard a car with a loud muffler pass by his home several times before it stopped, at which time he got up to investigate. He observed a male coming across his lawn, turned on his porch light, opened the door, and came face to face with Krueger. Iasparro also noticed that a white male was driving the dark, two-door car. Iasparro's neighbor observed the incident and heard Krueger say "That's the fellow" or "guy" as he was getting back into the car. At 11:40 p.m., Iasparro heard the same muffler noises immediately preceding the gun fire and, at approximately 1 a.m. on September 12, 1986, identified the car and Krueger at the scene of defendant's and Krueger's arrest.

Additionally, four witnesses testified that they had seen defendant with Krueger on the night of the offense: the owner of Tom's Tap and Christine Krueger observed them together between 9 and 9:30 p.m. The manager of the Surf Lounge saw them together between 10 and 11:15 p.m. Finally, defendant was arrested with Krueger at approximately 12:13 a.m. on September 12, 1986.

Moreover, there is undisputed evidence that defendant purchased the weapon, which used an unfamiliar brand of shells called "Para Geco," on January 26, 1986. Two spent Para Geco casings were recovered from the car in which defendant was stopped, and several others were found at the scene of the shooting. A number of live Para Geco shells were found at defendant's home. The spent casings were identified as being fired from the weapon purchased by defendant. The projectile fragment taken from Iasparro's front door was also found to have been fired by this weapon, which was found buried at 36 Marquette Road, near the location where defendant and Krueger had been arrested.

We are satisfied that the evidence established defendant's guilt be-

yond a reasonable doubt.

■ Defendant's final argument is that the trial court abused its sentencing discretion in imposing a 10-year term of imprisonment. Defendant emphasizes that no harm came to Iasparro or his family, he has no prior criminal or juvenile record, and he has been regularly employed and supported a family. The State responds that defendant's argument ignores the seriousness and the violent nature of the crime, that the offense was planned, that defendant committed the offense while on bond, and that there was some emotional harm to the Iasparro children.

The standard of review of a sentence claimed to be excessive is whether, in fact, the trial court exercised its discretion and, if so, whether this discretion was abused. (*People v. Cox* (1980), 82 Ill. 2d 268, 275, 412 N.E.2d 541; *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.) While Supreme Court Rule 615(b)(4) gives a reviewing court the discretionary power to reduce an excessive sentence (107 Ill. 2d R. 615(b)(4)), the trial judge, rather than the reviewing court, is in a superior position to consider and determine the punishment to be imposed, and the trial court's decision in that regard is entitled to great deference and weight, and, absent an abuse of discretion, a sentence may not be altered upon review. *Perruquet*, 68 Ill. 2d at 154, 368 N.E.2d at 884.

The record, here, clearly reflects that the trial court properly considered the statutory factors in mitigation and aggravation (see Ill. Rev. Stat. 1985, ch. 38, pars. 1005—5—3.1, 1005—5—3.2) before imposing a 10-year sentence of imprisonment. The sentence was well within the statutory range of punishment by imprisonment for attempted murder, which is punishable by a term of not less than 6 years and not more than 30 years (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4(c)(1), 1005—8—1(a)(3)). We find no abuse of sentencing discretion.

For the foregoing reasons, the judgment of the circuit court of Winnebago county is affirmed.

Affirmed.

LINDBERG, P.J., and UNVERZAGT, J., concur.