# Illinois Official Reports

## Appellate Court

---

**People v. Schlott, 2019 IL App (3d) 160281**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BRADLEY M. SCHLOTT, Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-16-0281 |
| Filed<br>Rehearing denied | May 29, 2019<br>June 25, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 09-CF-606; the Hon. Amy Bertani-Tomczak, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Peter A. Carusona, and Mark D. Fisher, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, Thomas D. Arado, and Richard T. Leonard, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion.<br>Justices Lytton and O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1        A jury found defendant, Bradley M. Schlott, guilty of attempted first degree murder. The circuit court sentenced defendant to a term of 12 years' imprisonment. On appeal, defendant argues that (1) the court erred in denying his request for an aggravated battery instruction, (2) the court erred in admitting certain evidence, and (3) the State committed prosecutorial misconduct in its closing arguments. We affirm.

¶ 2                                                    I. BACKGROUND

¶ 3        The State charged defendant with attempted first degree murder (720 ILCS 5/8-4(a), 9-1 (West 2008)) and aggravated domestic battery (*id.* § 12-3.3). The indictment alleged that defendant struck Kimberly Hurschik about the body with a knife.

¶ 4        Prior to trial, the State filed a motion *in limine*, seeking to admit a letter written by defendant to "Carl Helen & Chuck"—Hurschik's father, mother, and uncle, respectively. The State alleged that the letter was found in an office of the house shared by defendant and Hurschik and that family members had confirmed the letter to be written in defendant's handwriting. The letter was signed "Brad." The State alleged that the letter was probative of defendant's preparation and planning for his attack on Hurschik and was thus probative of his intent to kill. Defendant, in turn, filed a motion *in limine*, seeking to exclude from evidence a notebook allegedly written by defendant. The motion alleged that the admission of the notebook would be more prejudicial than probative.

¶ 5        At a hearing on the competing motions, the State revealed that the notebook in question, actually a legal pad, contained a letter written to Vic (Hurschik's boss), a letter to Hurschik herself, and the letter to the Hurschik family. Defendant did not object to the introduction of the letter to Hurschik. The court allowed the letters to be introduced as evidence, but ordered the letter to Hurschik's family and the letter to Vic to be redacted. Specifically, the court ordered redacted from the letter to Hurschik's family the line: "If I did everything I set out to do [Ruben Trejo] is dead now as well." From the letter to Vic, the court ordered redacted the lines, "I'm not sorry for what I did at all" and "If I did not kill [Trejo] you should fire him."

¶ 6        At a later court date, the State indicated that it had redacted the evidence in question as ordered. The State maintained, however, that the redacted portions might be relevant in rebuttal. The State also advised that it would be dropping the aggravated domestic battery charge and only proceeding on the attempted first degree murder charge.

¶ 7        At trial, Hurschik testified that on March 12, 2009, she was living with defendant. She and defendant had been in a relationship for the prior nine years but were broken up at that time. Despite the breakup, defendant continued living with Hurschik while he looked for a new place to live.

¶ 8        Hurschik recalled that in November 2008, she, a girlfriend, and Ruben Trejo went shopping together to pick out a bracelet for Trejo's wife. Hurschik and Trejo were coworkers. Early the next morning, defendant pulled Hurschik out of bed by her hair, asking whose phone number was in her phone. It was at that point that Hurschik decided to end the relationship with defendant. She devised a plan in which she would pretend to be in a relationship with Trejo so that defendant "would let [her] go."

¶ 9 Hurschik had known Trejo for approximately a year and a half. Hurschik began exchanging messages with Trejo, expecting that defendant would be monitoring her phone. On January 23, 2009, Hurschik was driving to work when she received a phone call from defendant. Defendant told Hurschik that he had been at her work, and he asked her to come home. Hurschik denied the request and proceeded to work, where she noticed that her coworkers were "pretty upset." She learned that defendant had, in fact, visited her work. She broke up with defendant that day. Defendant continued to call Hurschik that day, and Hurschik testified that the approximately 60 phone calls were "getting to the point where my boss was getting very angry."

¶ 10 When Hurschik arrived home from work that day, she noticed an orange residue on one of the walls in the home. Defendant told her that it was vomit and that he had attempted to kill himself by ingesting melatonin and alcohol. Hurschik did not believe that defendant had actually attempted to kill himself. She had encouraged defendant in the past to seek help. Defendant told her that he was seeing a doctor and had been prescribed Wellbutrin, but Hurschik had never seen defendant with any prescription medications. She only recalled that he had been prescribed Wellbutrin in 2000, following his divorce.

¶ 11 On March 12, 2009, at approximately 5 a.m., Hurschik and defendant were in the bathroom together. Defendant and Hurschik argued over who had lost more weight. Defendant left the bathroom after the argument; Hurschik testified that it sounded as if defendant went downstairs.

¶ 12 Defendant returned to the bathroom approximately 15 minutes later. Defendant knocked on the door, and Hurschik opened it. Hurschik testified: "He basically grabbed me by the neck and shoved me into the opposite wall of the bathroom and knocked me to the ground." She continued: "He proceeded to punch me as hard as he could on the side of my face for what felt like a very long time." Defendant eventually relented. He left the bathroom to go to the bedroom, leaving Hurschik on the floor. Hurschik testified that she tried to stand but that doing so was difficult because "[t]here was so much blood."

¶ 13 Hurschik eventually stood up and tried to make her way to the stairs, in an effort to exit the house. As she did so, she noticed defendant in the bedroom, looking through a nightstand. As Hurschik passed the bedroom door, defendant grabbed her by the hair, threw her to the ground, then knelt on her. Hurschik testified that defendant began choking her with one hand while holding his other hand behind his back. He eventually pulled out a knife from behind his back. Hurschik described the knife as a hunting knife, with a serrated edge and a hook on the tip.

¶ 14 Hurschik testified that defendant "tried to come at" her with the knife, and the knife cut her thumb as she attempted to block it. She continued: "I was in shock. I said, You almost cut my thumb off. And he said, I'm going to cut your fucking head off." Defendant then cut off a portion of Hurschik's hair with the knife, while "yelling accusations" at her. Defendant then "sliced" Hurschik's neck, as well as her side.

¶ 15 Hurschik testified that she begged for her life. She attempted to reason with defendant, telling him that he would go to jail. According to Hurschik, defendant replied that he would not go to jail "because he was going to kill himself after." Hurschik told him that his children— from his previous marriage—would have to live knowing their father was a murderer. At that statement, defendant "got up and then he walked across the room." Hurschik tried to get up to call 911 but was too dizzy from blood loss to stand. She begged defendant to call 911. After repeated pleas, defendant did, in fact, call 911.

¶ 16        After calling 911, defendant hung up the phone and threw it down. Hurschik asked for the phone so she could call 911. Hurschik testified that defendant "paced around" and acted as though he did not want Hurschik to call 911. He eventually allowed her to place the call. As she did so, defendant left "to try and dispose of the knife." When he returned, Hurschik begged him for help attending to her wounds. Defendant told her that she must tell police that what happened had been an accident. She agreed. Defendant retrieved a towel and helped Hurschik apply pressure to the wound on her neck. Paramedics took Hurschik to the hospital, where she was treated over the next four days. Pictures were published to the jury showing Hurschik's swollen face and black eyes, as well as wounds to her neck and side.

¶ 17        Hurschik returned to her home with her father on March 18, 2009. She testified that on that date she found "a notepad that [defendant] has written on" in the room that defendant used as an office. Within the notepad Hurschik found letters to herself, her family, and her employer. She also found a list on top of a china cabinet. She recognized the handwriting on the list to be that of defendant. She had been familiar with defendant's handwriting for a period of 11 years. Hurschik read the list to the jury: "Type letters, kids, Hurshiks [*sic*], Vic, get envelopes, get knife, get sleeping pills, get strips, arrange evidence, call kids three, shoes five. Some of the items are marked with an arrow pointing to Walgreens. And at the bottom it looks like it says groceries." Hurschik also noted that "get envelopes, get knife, get sleeping pills, get strips, and groceries" were crossed off on the list.

¶ 18        Hurschik testified that the date "1/26/09" was written in the notepad, two pages prior to the letter addressed to her. Hurschik testified that the letter was in defendant's handwriting. The letter to her appeared first in the notepad of the three letters in question. A copy of that letter was admitted, and the State read the letter to the jury. The letter requested that Hurschik come home right after work so that they could discuss whether to "continu[e] this and resolv[e] this mess." The letter said that defendant was hurt but would have no hard feelings if Hurschik chose to end the relationship.

¶ 19        Hurschik testified that she found the letter addressed to her family "[t]oward the end" of the notepad. The State again read the letter to the jury. The letter began: "[F]irst of all I want to say I'm sorry to all of you for what has happened here." Defendant further wrote: "I can't tell you enough on how much I loved her. That is why all of this hurt has led to where we are today." The letter stated that Hurschik was having an affair with Trejo. Defendant continued: "[S]he was going to put me out and have him move into my house. And I had no recourse. *** She needs to be stopped." Defendant also requested: "I hope you see to it that the boys get some of the assets. This is not their fault. Don't make them pay for their dad's poor decisions." The letter was signed, "Brad."

¶ 20        Hurschik testified that she found the letter to her employer, Vic, in the same notepad. The State once again read the letter to the jury. The letter informed Vic that Hurschik and Trejo had been having an affair for at least six months. It accused Vic and his employees of covering for or enabling Hurschik and Trejo. The State noted that a list was written in the margin of the letter to Vic. That list was: "[z]ip strips, easy to find and hunting knife, sleeping pills."

¶ 21        On cross-examination, Hurschik repeatedly denied that she was having an actual affair with Trejo. When defense counsel recounted the many flirtatious messages exchanged over Facebook and e-mail, Hurschik insisted it was a ruse for defendant's benefit. The messages between her and Trejo continued after her January breakup with defendant because defendant still believed they might get back together. When defendant confronted her about having an

affair, she would deny it. Hurschik admitted that she exchanged messages with Trejo over e-mail in which she said he would have to kick her ex-boyfriend out of the house and asked Trejo when he was moving in.

¶ 22 Audio recordings of two 911 calls from March 12, 2009, were played for the jury. The first call, placed at 5:41 a.m., featured a male voice asking for help for a stabbing victim and urging that paramedics be sent. The second call, placed at 5:45 a.m., featured a female voice asking for help.

¶ 23 Brian Matichak and Phillip Emph of the Joliet Police Department responded to the scene. Matichak encountered defendant yelling for help and applying a towel to Hurschik's wounds. He observed multiple wounds on Hurschik, as well as strands of her hair on the floor. While Matichak assisted with first aid, defendant repeatedly told him that "it was an accident." Emph noticed that defendant had blood on his clothing and arms. Defendant pointed Emph to where he could find the knife. Emph located a hunting knife two houses west of Hurschik's residence. The blade of the knife had blood on it. DNA extracted from the knife matched that of Hurschik.

¶ 24 Dr. Marius Katilus testified regarding the extent of Hurschik's injuries. He testified that he performed surgery on March 12, 2009. Her injuries were life threatening. Without treatment, Hurschik could have bled to death.

¶ 25 After the State rested, the defense called a single witness, Dr. Robert Galatzer-Levy, a psychiatrist. He opined that, at the time defendant attacked Hurschik, he was unable to conform his conduct to the requirements of the law or appreciate what he was doing as a result of involuntary intoxication. Specifically, Galatzer-Levy testified that defendant was taking Budeprion, a generic form of Wellbutrin, which caused irritability, anger, and violence. He testified at length concerning the effects of Budeprion and defendant's personal and familial history of depression. He opined that the Budeprion caused defendant to act impulsively, irrationally, and with hostility.

¶ 26 The State called Dr. Michael Schrift, a psychiatrist, in rebuttal. He testified that he could not give an opinion as to whether defendant was involuntarily intoxicated at the time of the offense. He acknowledged that Budeprion, which had since been taken off the market, could lead to an increase in suicidal tendencies. He was not familiar with studies indicating that it could lead to an increase in violent behavior, nor was he familiar with a number of statistics or articles discussed by Galatzer-Levy. Schrift agreed with Galatzer-Levy that defendant had been prescribed the maximum dosage of Budeprion, despite the fact that the standard protocol for the drug was to start with a lower dosage and increase as needed.

¶ 27 The State also recalled Hurschik in rebuttal, seeking to introduce the redacted portions of the letters to rebut Galatzer-Levy's testimony. Prior to Hurschik's testimony, the parties argued at length regarding whether unredaction was proper. The court allowed the State to introduce the statement from the letter to Vic: "I'm not sorry for what I did at all." It did not unredact the statement from the letter to Hurschik's family: "If I did everything I set out to do [Trejo] is dead now as well," reasoning that the reference to another potential murder would be too prejudicial.[1] Hurschik testified in accordance with these rulings.

¶ 28 Before the State's rebuttal, the defense requested that the jury be instructed on the lesser-included offense of aggravated battery. The defense argued that it was presenting two defenses:

---

[1]The State made no request to unredact, from the letter to Vic, the line: "If I did not kill [Trejo] you should fire him."

- 5 -

involuntary intoxication and failure to prove intent to kill beyond a reasonable doubt. The court denied the request. The defense moved for reconsideration after the close of evidence. The court commented that the defense was raising involuntary intoxication as its defense, at which time defense counsel reminded the court that there would be two defenses. The court then denied the motion to reconsider, commenting: "[T]his type of lesser included offense would be totally inconsistent. I'm going to deny your request."

¶ 29      In closing argument, the State emphasized defendant's comments in the letter to Vic that he was not sorry for what he had done. The State concluded: "[Defendant] is not sorry for what he did to [Hurschik] on March 12th, 2009. Make him sorry."

¶ 30      In its closing argument, the defense questioned Hurschik's testimony that she had fabricated the affair with Trejo, commenting: "[S]he was either having an affair at the time with a married man *** or she's one devious deceitful liar who went to extraordinary means to torment her live-in boyfriend." Counsel then recounted the purported inconsistencies between Hurschik's testimony and her prior statements, arguing that Hurschik and defendant in fact remained in a relationship up to the time of the incident. Counsel argued: "Even if she was having an affair, if she was lying to cover up, or she was faking an affair and she lied by not telling him about it, once you start down that slippery slope of lying, everything that that person says has to be suspect."

¶ 31      In rebuttal, the prosecutor argued: "[Defense counsel] spent a lot of his argument talking about Kim Hurschik, and apparently she's a whore or a liar or some other reason we can't believe whatever she's saying." She continued: "[I]f you were to listen to this argument regarding the cheating and whether there was cheating or whether there was not cheating—thankfully we live in America where you are not allowed to behead people who have cheated on you, because that's exactly the argument that's been put forth." Defense counsel objected, and the court informed the jury that it was free to disregard unreasonable inferences. The prosecutor continued: "It makes absolutely no difference in this case whether [Hurschik] had an affair with somebody at her work or she didn't. You can't kill her for that." The prosecutor concluded her argument: "This is the fault of one person, and that is [defendant]. Make him pay for his own poor decisions." Defense counsel again objected and later moved for a mistrial based on the State's remarks in closing. The court denied that motion.

¶ 32      The jury found defendant guilty of attempted first degree murder. At a subsequent hearing, the court sentenced defendant to 12 years' imprisonment.

¶ 33                                    II. ANALYSIS

¶ 34      On appeal, defendant raises three arguments. First, he argues that the circuit court's denial of his request for an aggravated battery instruction deprived him of a fair trial. Next, he argues that the court's admission of certain portions of the letters was an abuse of discretion. Finally, he argues that the State's emotional appeals and inflammatory comments in closing argument amounted to prosecutorial misconduct.

¶ 35                                    A. Jury Instruction

¶ 36      Our supreme court has made clear that, when a defendant challenges the circuit court's refusal to instruct the jury on a lesser-included offense, an abuse of discretion standard is applied on review. *People v. Mohr*, 228 Ill. 2d 53, 65 (2008). Defendant argues, however, that

*de novo* review is appropriate here "because the judge's exercise of discretion was frustrated by the erroneous legal ruling that instruction on the lesser offense was barred by the affirmative defense." We reject this argument. Even if defendant is correct that an erroneous legal ruling mandates *de novo* review, there was no such ruling in this case. The circuit court, in originally denying the request for an aggravated battery instruction, did not do so because of the involuntary intoxication defense. While the court mentioned that defense immediately before denying the motion to reconsider, it never explicitly tied its refusal to issue the instruction to that defense. We therefore follow the instruction of our supreme court and apply an abuse of discretion standard.

¶ 37 A defendant does not have an automatic right to any lesser-included offense instruction. *People v. Perry*, 2011 IL App (1st) 081228, ¶ 28. In *People v. Garcia*, 188 Ill. 2d 265, 284 (1999), our supreme court held that a lesser-included offense instruction should be given upon request of the defendant where "the evidence would permit a jury rationally to find the defendant guilty of the lesser-included offense and acquit of the charged greater offense." Some or slight evidence "that tends to prove the lesser offense rather than the greater" will satisfy that requirement. *People v. Novak*, 163 Ill. 2d 93, 108-09 (1994), *abrogated on other grounds by People v. Kolton*, 219 Ill. 2d 353 (2006); see also *People v. Upton*, 230 Ill. App. 3d 365, 374 (1992) ("It is well settled that where there is even slight evidence in the record which, if believed by the jury, would reduce the crime to a lesser-included offense, an instruction defining the lesser offense should be given.").

¶ 38 Defendant asserts that some evidence at trial supported the defense that defendant acted merely with the intent to injure Hurschik—rather than with the intent to kill her—such that the jury could have convicted him of aggravated battery while acquitting him of attempted first degree murder. Specifically, defendant points out that he did not inflict fatal wounds, despite being in a position to do so. He also points out that he aided Hurschik by calling 911, attending to her wounds, and summoning police when they arrived at the scene.[2]

¶ 39 First and foremost, all the evidence identified by defendant occurred *after* his attack on Hurschik. The actions he took after he attacked Hurschik do not have a direct bearing on his state of mind in the moment itself. To sustain a conviction for attempted first degree murder, the State must prove that a defendant intended to kill the victim and took a substantial step toward that end. *People v. Cavazos*, 2015 IL App (2d) 120171, ¶ 88; 720 ILCS 5/8-4(a), 9-1 (West 2008). "Such intent may be inferred if one wilfully does an act, the direct and natural tendency of which is to destroy another's life." *People v. Migliore*, 170 Ill. App. 3d 581, 586 (1988). Evidence that defendant may have, after the fact, not wanted Hurschik to die does not inherently negate that requirement.

¶ 40 This is not a scenario in which the jury simply believing the evidence in question would support an acquittal of attempted first degree murder and a conviction for aggravated battery. See *Upton*, 230 Ill. App. 3d at 374. It is uncontested that defendant did take those actions— calling 911, assisting in first aid, and directing police to her location upon their arrival at the house. Defendant's argument on appeal requires far more than that the jury simply believe that evidence. It requires that the jury draw a very precise set of inferences from that evidence.

---

[2]Defendant does not argue that the evidence of involuntary intoxication is relevant to this analysis, presumably because that evidence would tend to negate the *mens rea* element of both attempted murder and aggravated battery alike.

Specifically, the jury needed to infer not just that defendant did not want Hurschik to die in that moment but that he *never* intended that she would die. Given that other evidence in the case would directly refute such an inference, the jury here could not rationally have reached such a conclusion. See *Garcia*, 188 Ill. 2d at 284.

¶ 41    Defendant's intent to kill Hurschik can be strongly inferred from his conduct throughout the attack. See, *e.g.*, *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 10. The attack began when defendant threw Hurschik to the ground in the bathroom and punched her repeatedly as hard as he could. If defendant's intent throughout the attack was "simply to injure" Hurschik, as he argues on appeal, one must wonder why, after leaving Hurschik bloodied and beaten in the bathroom, he took the intentional step of going to the bedroom to search for a hunting knife. Indeed, defendant's theory that his postattack assistance demonstrated the lack of intent to kill is further rebutted by the fact that he did not aid Hurschik until apparently contemplating it for a while, then disposing of the knife two houses away. Clearly, defendant was in no hurry. Most importantly, the sheer magnitude of defendant's attack—beating Hurschik, tackling her, choking her, and repeatedly cutting or stabbing her—tends to indicate that he intended to kill her.

¶ 42    While intent must normally be inferred from circumstantial evidence, the State here was able to present direct evidence of defendant's mental state as well. For example, defendant threatened to kill Hurschik by cutting her head off. Defendant urges that "[m]any people, in the heat of the moment, say things they do not mean, including threatening to kill another person they may be fighting with." While defendant is no doubt correct, the evidence does not show that defendant and Hurschik were "fighting." It shows that defendant was on top of her, cutting her repeatedly, including on the neck. In this context, defendant's threat to kill Hurschik is *extremely* probative of his intent to kill her.

¶ 43    Of course, the State also presented direct evidence of defendant's intent through the writings Hurschik found in the home after the attack. Defendant's letter apologizing to Hurschik's family clearly contemplates that Hurschik is deceased. This intent and preparation was corroborated by the handwritten list, which includes the phrase "get knife," as well as the list found in the margins of the letter to Vic, which includes "hunting knife," the very type of knife used in the attack. While defendant correctly notes that the writings were not dated, the presence of the written date January 26, 2009, located in the notepad prior to the three letters, allowed the jury to infer that they were written between that date and the March 12, 2009, date of the offense. That defendant apparently followed through on that plan by attacking Hurschik with a hunting knife strongly indicates his intent to kill her.

¶ 44    In sum, the voluminous evidence—both direct and circumstantial—of defendant's intent to kill Hurschik would render it wholly irrational for the jury to infer that his postattack assistance demonstrated that he never intended to kill Hurschik. Accordingly, we find that the circuit court did not abuse its discretion by declining defendant's request for an aggravated battery instruction.

¶ 45                                    B. Evidence

¶ 46    Defendant next argues that certain portions of the letters found by Hurschik should not have been admitted at trial. The portions defendant contends should have been excluded are (1) in the letter to Vic, the line, "I'm not sorry for what I did at all" and (2) in the letter to Hurschik's family, "I want to say I'm sorry to all of you for what has happened here."

Defendant concedes that he failed to preserve his objection to the latter of the two statements but argues on appeal that counsel was ineffective for failing to object to it. We review the circuit court's ruling on the admissibility of evidence for an abuse of discretion. *People v. Morgan*, 197 Ill. 2d 404, 455 (2001).

¶ 47 With respect to both of the challenged statements, defendant contends that "the letters lacked a proper evidentiary foundation and the statements of apology[3] included in those letters should never have been read to the jury." Specifically, defendant points out that neither letter was dated, mailed, or made any explicit mention of a plan to attack or kill Hurschik. Defendant argues that either letter could have been referring to times or incidents unrelated to the March 12, 2009, attack, and that their relevance is therefore entirely speculative. While such foundational shortcomings would seem to cut against the admission of the letters in their entirety—rather than merely certain statements within those letters—we will address the argument as presented by defendant.

¶ 48 Foundational evidence is simply evidence that establishes the admissibility of other evidence. *People v. Bush*, 214 Ill. 2d 318, 333 (2005). Contrary to defendant's claims, the State presented evidence establishing that the letters were relevant. Hurschik testified that the letters were in defendant's handwriting, found in a notepad containing defendant's handwriting. Hurschik was familiar with that handwriting, and had been for 11 years. The notepad itself was found in defendant's office. The letter to Hurschik's family was signed "Brad." The letters were found on pages of a notepad after a page dated January 26, 2009, with the letter to her family being found "[t]oward the end" of the notepad. The State thus established a six-week time frame in which defendant could have written the letters. While defendant correctly points out that the State could not establish a specific date within that time frame, we find that the six-week span was sufficient to give the letters probative value; the lack of a specific date goes to the weight of the evidence rather than its admissibility.

¶ 49 The substance of the letters themselves, while not explicitly referencing an attack on Hurschik, still demonstrates their relevance to the case. In the letter to Hurschik's family alone, defendant apologizes, states that Hurschik needs to be stopped, tells her family that he "loved" her, and asks that they "see to it that the boys get some of the assets." It is not speculation, but a fair inference, that this letter related to a plan to kill Hurschik. Similarly, defendant urges that the letter to Vic may have concerned defendant's January appearance at Hurschik's work. Yet the letter to Vic contained in its margins a list that included "hunting knife" and "sleeping pills." More importantly, the handwritten list found by Hurschik contained the following: "Type letters, kids, Hurshiks [*sic*], Vic, get envelopes, get knife, get sleeping pills." That evidence tied the letter to Vic to the same time frame as the letter to Hurschik's family, as well as to the hunting knife. Clearly, the State established the relevance of the letters. That is, the letters were probative of defendant's apparent plan to murder Hurschik and then commit suicide.

¶ 50 Defendant also puts great weight on the fact that the court initially ruled that the nonapology in the letter to Vic should be redacted, then reversed that ruling on the grounds that it was admissible to rebut Galatzer-Levy's testimony. Defendant insists that the court had no justification for changing its ruling. However, the concern of the reviewing court is the correctness of the result reached by the circuit court, not the correctness of that court's

---

[3]Or, in the case of the letter to Vic, nonapology.

reasoning. *People v. Johnson*, 208 Ill. 2d 118, 128 (2003). Here, the court's ultimate ruling was that the comment to Vic that defendant was not sorry for what he did was admissible. Neither this ruling nor the court's ruling allowing the apology to Hurschik's family was an abuse of discretion. In turn, defense counsel was not ineffective for failing to object to the admission of the latter piece of evidence, as such an objection would have been fruitless.

¶ 51                                    C. Prosecutorial Misconduct

¶ 52        Finally, defendant argues that a number of purportedly inflammatory comments made by the prosecutors in their closing arguments amounted to prosecutorial misconduct and reversible error. While the prosecutor is afforded wide latitude in making his or her closing arguments, prosecutors may not make "inflammatory arguments designed solely to arouse the passions of the jury." *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998). The circuit court's ruling on the propriety of comments made in closing argument will not be disturbed absent an abuse of discretion. *Id.*

¶ 53        Defendant first contends that the State improperly remarked: "[Defense counsel] spent a lot of his argument talking about Kim Hurschik, and apparently she's a whore or a liar or some other reason we can't believe whatever she's saying." He asserts that the use of the term "whore" insinuated "that defendant had misogynistic feelings towards women." Defendant also argues that it was improper for the State to argue: "[T]hankfully we live in America where you are not allowed to behead people who have cheated on you, because that's exactly the argument that's been put forth." Defendant contends that the references to America and to beheading "were especially prejudicial" because they conjure images of ISIS and the French Revolution.

¶ 54        Defense counsel's primary point in closing argument was that Hurschik lacked credibility, whether her testimony was true or not. If her testimony was true, then she lied to and deceived defendant for five months with an elaborate ploy to make him believe she was cheating on him. If not, then she was actually having an affair with Trejo for at least five months. The State's summary that defense counsel alleged the victim to be either a "whore or a liar" was, in substance, accurate. The State never asserted that defense counsel actually used the word "whore," and the mere use of strong language does not rise to the level of prosecutorial misconduct. Further, it is unclear how the prosecutor's use of that word could insinuate anything about defendant's feelings toward Hurschik or any other woman, as the prosecutor never implied that defendant used the word.

¶ 55        Similarly, the State's reference to a beheading was not improper. While defendant argues that the comment evokes images of ISIS or the French Revolution, it is more accurate to say that it evokes images of the actual evidence in the case. Hurschik testified that defendant threatened to cut her head off. It is absurd to suggest that the State could not reference beheading in closing argument.

¶ 56        Defendant next argues that the prosecutors' comments of "[m]ake him sorry" and "[m]ake him pay" were inflammatory and improper invitations for the jury to step into the shoes of the victim. Defendant ignores the fact that both of these statements were explicit references to defendant's own words. The suggestion that the jury "[m]ake [defendant] sorry" was made in response to defendant's letter to Vic that he was "not sorry for what [he] did at all." The request to "[m]ake [defendant] pay" was tied to defendant's request to Hurschik's family that his sons should not pay for his poor decisions. The prosecutor agreed that defendant's sons should not

pay but that it should, in fact, be defendant who did so. In short, neither of these comments were inflammatory calls for vengeance from the jury, but references and replies to defendant's own words.

¶ 57                                III. CONCLUSION

¶ 58        For the foregoing reasons, we affirm the judgment of the circuit court of Will County.

¶ 59        Affirmed.